**In re Honorable Nathan HECHT, Texas Supreme Court Justice.**

No. A–2006–1.

Special Court of Review Appointed by the Supreme Court.

Oct. 20, 2006.

Jackson Walker, L.L.P., Charles L. Babcock, Houston, for Petitioner.

Seana Willing, Executive Director, State Com'n on Judicial Conduct of Austin, TX, Mark Greenwald, San Antonio, for The Commission.

Before Justices FITZGERALD,[1] McCLURE,[2] and MAZZANT[3].

## OPINION

Opinion by Justices FITZGERALD and MAZZANT.

## I.

This case focuses on whether the Texas Code of Judicial Conduct, the judicial "rules of the road," so to speak, prohibit a Texas state judge from speaking out favorably in behalf of a close friend nominated to the United States Supreme Court. This case hinges on the meaning of words in this Code and what words were spoken by the judge. This case involves a composite of two different political systems for the selection of judges. In Texas, we have an elective process, whereas in the federal system, we have a nomination-confirmation process.

We recognize at the outset a considerable hurdle must be overcome: the Texas Code is decidedly deficient in a pivotal area important in this case, that is, providing definitive meanings to words in the political arena, words such as "authorized," "endorsing," and "private interests." We are all familiar with certain axioms in particular disciplines, some of which capsulize the core of the undertaking. For example, in real estate, the appropriate axiom is "location, location, location." In music, "practice." In law, "definitions." The relevant provisions of the Texas Code, Canons 5(2) and 2B, quite candidly, lack definitive meaning.

The political processes offer a unique twist. The state judge is up for re-election

1. The Honorable Kerry FitzGerald, Justice, Court of Appeals, Fifth District of Texas at Dallas: Presiding Justice of the Special Court of Review, appointed by Chief Justice Wallace B. Jefferson, Texas Supreme Court, by a process of random selection.

2. The Honorable Ann McClure, Justice, Court of Appeals, Eighth District of Texas at El Paso: Justice of the Special Court of Review, appointed by Chief Justice Wallace B. Jefferson, Texas Supreme Court, by a process of random selection.

3. The Honorable Amos Mazzant, Justice, Court of Appeals, Fifth District of Texas at Dallas: Justice of the Special Court of Review, appointed by Chief Justice Wallace B. Jefferson, Texas Supreme Court, by a process of random selection.

and is in a political campaign. The state judge speaks of his friend, the nominee, whose nomination is pending before the Senate Judicial Committee of the United States Congress. In this federal process, the public expects a thorough examination of the background, qualifications, and experience of the nominee in public, and most assuredly, at the Senate committee hearings. The Senate committee fully intended to call the state judge as a witness during the confirmation hearings, and the state judge fully intended to testify to the same statements before the committee which are at issue here. No one claims such statements would have violated the Texas Code of Judicial Conduct. Had the confirmation proceeded as scheduled and the state judge testified, it is highly doubtful we would be considering any of these matters, anonymous complaint or not.

■ We also recognize the commission's approach and this Court's approach are substantially different. The commission, according to the evidence, assumed the Code prohibited endorsing and supporting, terms it used interchangeably, and proceeded to devote substantially all of its efforts to determining the penalty to be imposed. This Court performs a de novo review. We consider the evidence presented before us (which differs markedly in some respects from evidence presented to the commission), we review Canons 5(2) and 2B, with our starting point being the determination of the meaning of pivotal terms, such as "authorized," "endorsing," and "private interests" (rather than assuming certain of these terms can be used interchangeably),[4] and we decide whether the judge's public statements violated Canons 5(2) and 2B.

## II.

The Preamble to the Texas Code of Judicial Conduct provides:

> Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. The role of the judiciary is central to American concepts of justice and the rule of law. Intrinsic to all sections of this Code of Judicial Conduct are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of facts and law for the resolution of disputes and a highly visible symbol of government under the rule of law....

> The Code [of Judicial Conduct] is intended ... to state basic standards which should govern the conduct of all judges and to provide guidance to assist judges in establishing and maintaining high standards of judicial and personal conduct.

TEX.CODE JUD. CONDUCT, Preamble, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. B (Vernon 2005). The Preamble reminds us of the high ideals and noble principles this Court is called upon to apply. This case presents substantial issues of first impression. First, we must determine whether public statements of a judge supporting a nominee to the United States Supreme Court violate the Texas Code of Judicial Conduct, specifically Canons 2B and 5(2). If so, we must determine whether the Texas Code abridges the Petitioner's freedom of speech guaranteed by the First Amendment to the United States Constitution. However, because we conclude Petitioner did not violate the Canons,

---

4. If we had determined Petitioner violated the Canons, we would have undertaken a constitutional analysis. The commission assumed the Canons were constitutional and proceeded accordingly.

we do not address the constitutional question.[5]

## III.

The events leading to the public admonition revolve around President George W. Bush's nomination of Harriet Miers to the United States Supreme Court in October 2005 and statements of the Honorable Nathan Hecht, Texas Supreme Court Justice, (hereafter "Petitioner") to the news media concerning her nomination.

On October 14, the commission voted to initiate an investigation of Petitioner based on the October 12 complaint and, on its own motion, an article published on October 6 in *The New York Times*. On October 17, 2005, the State Commission on Judicial Conduct received a confidential complaint about Petitioner based on the October 10 article in the *Texas Lawyer* newspaper. The commission informed Petitioner of the investigation and requested that he answer a questionnaire about the news articles and his actions preceding and during Miers' nomination. Petitioner cooperated with the commission and provided detailed responses to the questions. Petitioner voluntarily appeared at a hearing before eight[6] members of the commission. The commission voted[7] and issued its Public Admonition, containing its findings of fact and conclusions of law.[8] The commission determined Petitioner violated

---

**5.** We are mindful of the Supreme Court's principle of avoiding constitutional questions where possible. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Two iterations of this principle apply here: "It is not the habit of the [C]ourt to decide questions of a constitutional nature unless absolutely necessary to a decision of the case" and "The Court will not pass upon a constitutional question although properly presented by the record if there is also present some other ground upon which the case may be disposed of." *Id.* at 347, 56 S.Ct. 466. These principles apply to federal courts. *See Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 972, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (citing *Ashwander*, 297 U.S. at 346, 56 S.Ct. 466, for constitutional decision-avoidance principles, and stating "We may require federal courts to follow those rules, but we have no power to impose them on state courts."). But our Texas Supreme Court applies the same principle of avoiding constitutional questions where possible as expressed in *Ashwander*. *See, e.g., In re B.L.D.*, 113 S.W.3d 340, 349 (Tex.2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."), *Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex.1999) (same). The constitutional decision-avoidance principle is a "traditional policy" of the courts and "was conceived out of considerations of sound judicial administration." *Alma Motor Co. v. Timken–Detroit Axle Co.*, 329 U.S. 129, 142,

67 S.Ct. 231, 91 L.Ed. 128 (1946). Thus, in view of our disposition of the issues relative to Canons 5(2) and 2B, we do not analyze or decide Petitioner's constitutional arguments based upon content and viewpoint restrictions. *See Republican Party v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

**6.** The Texas Constitution states that the commission consists of thirteen members. Tex. Const. art. V, § 1–a(2). Judge Monica Gonzales, the chairman of the commission during these events, testified that three of the positions were vacant and two members recused themselves from the proceedings.

**7.** Judge Gonzales testified she could not remember the vote tally for finding Petitioner violated the Canons and imposing the admonition. She testified that the commission's deliberations were concerned with the level of sanction to impose, not whether Petitioner violated the Canons. "All I remember, if there was any discussion at all, it had more to do with what level of sanction, not whether or not there was a violation of the canon. I don't remember that being a major discussion at all."

**8.** The commission's conclusions and findings were based on *The New York Times* and the *Texas Lawyer* articles only.

Canons 2B and 5(2) of the Texas Code of Judicial Conduct. *See* Tex.Code Jud. Conduct, Canon 2B ("A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others....."), & Canon 5(2) ("A judge shall not authorize the public use of his or her name endorsing another candidate for any public office....").[9]

Petitioner requested de novo review of the public admonition rendered by the commission. Texas Supreme Court Chief Justice Wallace Jefferson appointed, by random selection, this panel to the Special Court of Review to review the commission's decision. *See* Tex. Gov't Code Ann. § 33.034(c) (Vernon 2004). This Court subsequently conducted an evidentiary hearing. *See id.* § 33.034(e) (review "is by trial de novo as that term is used in the appeal of cases from justice to county court"). Following the presentation of evidence and arguments, the commission sought a public admonition, and Petitioner requested dismissal of the sanction imposed on him.

## IV.

The parties entered into a written "Parties' Stipulations of Fact" (hereafter "Stipulation"). At the hearing before this Special Court of Review, the commission called one witness, Petitioner; the remainder of its presentation centered around documentary evidence, including news stories, public admonishments relative to other judges bearing generally on the two Canons at issue, several volumes of committee hearings involving the current Task Force on the Code of Judicial Conduct and its recommendations, several videos, and the Stipulation. The commission presented no expert testimony related to whether Petitioner violated the Code or whether the Code was constitutional under *Republican Party v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

Petitioner's testimony will be detailed below. In addition, Petitioner presented, without objection by the commission, the expert testimony of former Chief Justice Tom Phillips through his affidavit; the testimony of Judge Jim Parsons and Judge Monica Gonzalez; the expert testimony of Professor Geoffrey Hazard and Blake Tartt by stipulation; Senator Arlen Specter's oral deposition; official transcripts from numerous Senate confirmation hear-

---

**9.** The commission's conclusion stated:

The Commission concludes from the facts and evidence presented that [Petitioner] allowed his name and title to be used by the press and the White House in support of his close friend, Harriet Miers, a nominee for the office of United States Supreme Court Justice. Such public support by a judicial official elected to the highest court in Texas, in the eyes of the public and the rest of the judiciary, would be construed as an endorsement of Miers' candidacy, as those terms are commonly used and understood. Because the Commission views Miers' desire for a lifetime appointment to the United States Supreme Court to be a private interest, the efforts of Petitioner in promoting his friend's candidacy by responding to media inquiries and assisting the White House in its efforts to convince powerful special interest groups to support her candidacy, constituted an improper use of his office and position to promote Miers' private interest.

Citing *Republican Party v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), and *In Re Raab*, 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1291 (2003), the commission rejected Petitioner's argument that the application of Canons 2B and 5(2) infringed his First Amendment right to freedom of speech. The commission then stated,

Based on the circumstances surrounding this matter, the Commission concludes that [Petitioner's] actions on behalf of Harriet Miers constituted persistent and willful violations of Canons 2B and 5(2) of the Texas Code of Judicial Conduct.

ings of past United States Supreme Court Justices; and copies of the Codes of Judicial Conduct from many states.

The evidence shows Petitioner and Miers became close friends beginning in 1976 when they practiced in the same law firm, Locke Purnell. Petitioner left the firm in 1981 to become a district court judge. He subsequently served on the appellate bench, first on the Fifth District Court of Appeals at Dallas, and then the Texas Supreme Court, his current position. It is undisputed that Petitioner's record is unblemished.[10] The Stipulation recites that Petitioner "has never been sanctioned by the State Commission on Judicial Conduct."

Miers became head partner of Locke Purnell, and eventually became White House Counsel to President Bush. She also served as president of the State Bar of Texas and as a member of the Dallas City Council. Petitioner and Miers have remained close friends through the succeeding thirty-five years, including regularly attending the same church and going to dinners and social occasions together.

Besides being a long-time, close friend of Miers, Petitioner was also a friend of White House Deputy Chief of Staff, Karl Rove. On October 1, 2005, two days before Miers' nomination, Rove and Petitioner had a telephone conversation, and Rove told him Miers might be nominated to fill

---

**10.** The Stipulation and Petitioner's Trial Exhibit No. 1 reflect Petitioner's service record in more detail:

> [Petitioner] is the Senior Justice of the Supreme Court of Texas, having been elected in 1988 and re-elected in 1994 and 2000. He is the senior Texas appellate judge in active service.
>
> Throughout his service on the Court, [Petitioner] has overseen revisions to the rules of administration, practice, and procedure in Texas courts. In 2000, he was appointed by the Chief Justice of the United States to the Advisory Committee on Civil Rules for the Judicial Conference in the United States.
>
> [Petitioner] began his judicial service in 1981, when he was appointed to the 95th District Court in Dallas County. He was elected to that bench in 1982 and re-elected in 1984. In 1986 he was elected to the Court of Appeals for the Fifth District of Texas at Dallas, where he served until he was elected to the Supreme Court.
>
> Before taking the bench, [Petitioner] was a partner in the Dallas law firm of Locke Purnell Boren Laney & Neely (now Locke Liddell & Sapp). He joined that firm in 1976 and practiced mainly in the area of general business and commercial litigation. [Petitioner] received a B.A. degree with honors in philosophy from Yale University in 1971. He attended Southern Methodist University School of Law as a Hatton W. Sumners Scholar, and received his J.D. de-

> gree *cum laude* in 1974. He was elected to Order of the Coif and served as an editor for the *Southwestern Law Journal*. Following law school, he served as a law clerk to the Hon. Roger Robb, Circuit Judge, U.S. Court of Appeals for the District of Columbia Circuit. He also served in the U.S. Naval Reserve Judge Advocate General Corps, achieving the rank of Lieutenant. He was honorably discharged from military service in 1979.
>
> [Petitioner] is licensed to practice in Texas and the District of Columbia. He is a member of the American Bar Association, the District of Columbia Bar Association, the State Bar of Texas, the Dallas Bar Association, and the Austin Bar Association. He is also a member of the American Law Institute, a fellow in the American Bar Foundation, a life fellow in the Texas Bar Foundation, and a founding fellow of the Dallas Bar Foundation. He received the Outstanding Young Lawyer Award from the Dallas Association of Young Lawyers in 1984, the Southern Methodist University School of Law Distinguished Alumni Award for Judicial Service in 2000, and the Hatton W. Sumners Foundation Distguished Public Service Award in 2004. He has taught as an Adjunct Professor at the University of Texas School of Law.
>
> [Petitioner] is a member of the Texas Philosophical Society. He attends the Cornerstone Christian Church of Dallas, where he is a pianist, organist, and teacher.

retiring Justice Sandra Day O'Connor's place on the Supreme Court. Rove asked Petitioner if he would agree to speak with Dr. James Dobson (the founder of Focus on the Family, a conservative religious organization that emphasizes family values) about Miers' faith. Petitioner agreed to speak to Dr. Dobson, and he told Rove he was willing to speak to the media about Miers as he considered himself one of the most knowledgeable people, if not the most knowledgeable person, about Miers' personal and professional beliefs and accomplishments.

Out of an abundance of caution, Petitioner consulted first with former Texas Supreme Court Chief Justice Tom Phillips, considered a legal scholar and knowledgeable and experienced with respect to the Code of Judicial Conduct. Petitioner also consulted with former Texas Supreme Court Justice Priscilla Owen,[11] a friend with similar experience involving the Code of Judicial Conduct. Both assured Petitioner that the statements in question did not violate the Code.

Between Miers' nomination on October 3 and the announcement of her withdrawal on October 27, Petitioner responded to more than 120 requests for media interviews. Petitioner appeared on television news programs, and he was quoted or referenced in many newspaper and internet news articles. Petitioner's comments included discussions of his personal relationship with Miers, her professional background and accomplishments, her conservative political philosophy, her attendance and participation at an evangelical Christian church, and her pro-life and anti-abortion views. He expressed his opinion in a variety of ways that she would be a "great" Justice of the Supreme Court. Some news articles also reported that Petitioner said President Bush had known Miers for many years and that conservatives had no need to be concerned that she was an unknown entity. Petitioner was continuously identified as a close personal friend of Miers and as a Justice of the Texas Supreme Court.

Much of the commission's evidence consisted of media reports between October 3 and 27. The *Texas Lawyer* published an article on October 10, 2005 about Petitioner's and other present and former Texas Supreme Court Justices' participation in supporting the Miers nomination.[12] Al-

---

**11.** Justice Owen now sits on the United States Court of Appeals for the Fifth Circuit.

**12.** The *Texas Lawyer* article states, in part:

"I'm a PR office for the White House," [Petitioner] says jokingly about the 120 press interviews he estimates he did the week of October 3 to discuss Miers.... Media outlets reported that [Petitioner] and Miers dated on and off over the years, but [Petitioner] doesn't like that characterization. "Dating to me sounds like what you did in high school," [Petitioner] says. "We saw one another and went to dinner. We were good, closely connected friends then, and we are now."
[Petitioner] says he called White House Deputy Chief of Staff Karl Rove ... to see if it was OK for him to speak with the media. [Petitioner] says his mission is clear: to fill in the gaps about Miers' background and to counter some conservatives' skepticism about her qualifications to be a U.S. Supreme Court justice.
[Petitioner] ... relays an anecdote about Miers and himself from the 1980s: One evening, he and Miers had attended a lecture together at the Valley View Christian Church in North Dallas, where they were members. After that lecture, Miers shared with [Petitioner] her belief that life begins at conception and abortion is wrong. By repeating that story to reporters nationwide, [Petitioner] ... says he's not saying that he knows how Miers would decide any particular case that might come before her as a justice. But he says he knows she opposes abortion.
[Petitioner] says conservatives should rest easy about Miers' nomination and should not draw comparisons between Bush's

though Petitioner was never interviewed,[13] *The New York Times* published an article on October 6, 2005.[14] These were the only news articles presented at the commis-

nomination of Miers and President George H.W. Bush's 1990 nomination of Justice David Souter, whose slim record held no indication of his eventual liberal leanings on the court. "I have the utmost respect for President Bush No. 41, but I doubt he could have picked Justice Souter out of a lineup the day before he appointed the man," [Petitioner] says. "By contrast, Harriet and the president have worked together hand and glove for 10 years. He's called her for legal advice, he's called her for campaign advice, he's called her to vet judicial appointments. And he knows her as well as you could know anybody. And he's stood there and watched. You can never be totally sure, particularly concerning someone who has been given a lifetime appointment. But the difference between that situation and this one is night and day."

13. Petitioner testified he was not interviewed for the story and that it was written without any input from him.

14. The *New York Times* article states:

But she [Miers] still felt something was missing in her life, and it was after a series of long discussions—rambling conversations about family and religion and other matters that typically stretched from early evening into the night—with [Petitioner], a junior colleague at the law firm, that she made a decision that many of the people around her say changed her life.

"She decided that she wanted faith to be a bigger part of her life," [Petitioner], who now serves on the Texas Supreme Court, said in an interview. "One evening she called me to her office and said she was ready to make a commitment" to accept Jesus Christ as her savior and be born again, he said. He walked down the hallway from his office to hers, and there amid the legal briefs and court papers, Ms. Miers and Petitioner "prayed and talked," he said. To persuade the right to embrace Ms. Miers's selection despite her lack of a clear record on social issues, representatives of the White House put [Petitioner] on at least one conference call with influential social conservative organizers on Monday to talk about her faith and character.

Ms. Miers sometimes attended Mass at St. Jude Chapel in downtown Dallas, but before embracing evangelical Protestantism, her experience with religion was lukewarm and her attendance sporadic, [Petitioner] said.

A close relationship with [Petitioner]—also a longtime member of Valley View—who frequently appears with Ms. Miers at social functions in Washington and in Texas, has been a steady feature of her life for nearly 30 years. [Petitioner] is known as one of the most conservative members of the Republican-dominated Texas Supreme Court. Newspapers in Texas have reported that [Petitioner] and Ms. Miers were romantically involved, and when asked in an interview whether that was still the case, [Petitioner] responded that they were close, without going into great detail. "She works in Washington, I work in Austin," [Petitioner] said. "We have dinner when she's here; if she invites me to Washington I happily go. We talk on the phone all the time."

[Petitioner] and Ms. Miers spoke on Sunday evening, but she did not tell him about the pending announcement that she had been offered the nomination, he said. "She's a stickler for the rules," he said. He never asked Ms. Miers how she would vote on the issue of abortion if it came before the Supreme Court, he said. "She probably wouldn't answer, she wouldn't view it as appropriate."

"Yes, she goes to a pro-life church," [Petitioner] said, adding, "I know Harriet is, too." The two attended "two or three" anti-abortion fund-raising dinners in the early 1990's, he said, but added that she had not otherwise been active in the anti-abortion movement. "You can be just as pro-life as the day is long and can decide the Constitution requires Roe" to be upheld, he said.

Apart from the questions about abortion and other issues Ms. Miers will face in confirmation hearings, the strong tie she and [Petitioner] have to their church is undergoing a test. The congregation at Valley View is in the middle of a schism, and Mr. [Petitioner] said he and Ms. Miers are siding with the splinter groups that are forming a new church under Valley View's longtime pastor, Ron Key.

sion's hearing. Evidence of additional articles and interviews were presented before this Court. Rather than selecting "representative statements" from these sources, which are often redundant, and quoting them verbatim, we choose a more succinct method, excerpting from the commission's brief the primary statements it asserts violate Canons 2B and 5(2):

> For the most part, Petitioner provided reporters and interviewers with factual information about Miers' background and experience, including information about her views on religion and abortion and his own personal relationship with her. However, beyond the factual information, Petitioner repeatedly expressed his opinion that the Miers' appointment was "great," "solid," "strong," and that after the American people had been given a chance to review her record, they were "going to herald this nomination as a good one." When asked about the opposition to Miers' nomination during an interview reported by the Washington Post, Petitioner replied that he believed that Miers' detractors were "going to be happy as clams" after they learned more about her. When asked

by another interviewer about the need to prove the President's "case" in favor of the Miers' nomination, Petitioner agreed that a "case has to be made," but went on to claim that a "case has been made in Texas for the last 30–plus years. We think of her as a hero down here already." Petitioner went on to predict that during the confirmation process, Senators would be "convinced that this is the right person for the job." Tellingly, in one interview with an ABC news reporter, Petitioner expressly opined that Miers would be a "great justice."

On a more personal note, Petitioner acknowledged publicly that he had a close personal relationship with Miers, and frequently spoke of his "admiration" for Miers, describing her in various interviews as being "remarkable," "charming," "gracious," "solid," "strong," "sterling," and "stellar."

Former Chief Justice Phillips, whose extensive curriculum vitae was admitted, furnished an affidavit in support of Petitioner's position.[15]

---

**15.** Affidavit of Thomas R. Phillips:

My name is Thomas R. Phillips. I have personal knowledge of the facts stated in this affidavit.

I served as Chief Justice of the Supreme Court of Texas from January 4, 1988, until I retired on September 3, 2004. One of the administrative duties of the Supreme Court is the promulgation of the Code of Judicial Conduct. While I was Chief Justice, the Supreme Court completely revised the Texas Code of Judicial Conduct on one occasion and made discrete changes and additions several additional times. In each instance, I presided over that process and took a very active role in the Court's efforts.

Over the years, I believe that I have developed an expertise in the Code. I have spoken on judicial speech under the ABA Model Code and various state Codes on many occasions including to the Washington Judi-

cial Conference in Tacoma and to the entire Conference of Chief Justices. As a part of my efforts to reform judicial selection and enhance judicial independence, I frequently participated in commissions and task forces that explored, among other things, the balance between a judge's right (and occasionally obligation) to speak on matters of public concern versus the public's right to a court system which is and is seen as being impartial and unbiased. I explored such issues in some detail in the 2001 National Summit on Judicial selection, of which I was one of two co-convenors, and in my service on the American Bar Association's Commission on 21st Century Judiciary in 2002–03 and its Judicial Selection and Judicial Campaign Committee in 2001–03.

Even though I have now returned to private practice, I remain interested in and involved in issues of judicial speech. Most significantly, I am counsel of record for the

State of Minnesota on petition to the United States Supreme Court for writ of certiorari in *Republican Party v. White*, 416 F.3d 738 (8th Cir.2005), a case involving the constitutionality of certain restrictions on political speech by judges and judicial candidates. I am also a lifetime member of the Conference of Chief Justices, a member of the National Advisory Counsel of the American Judicature Society, and will soon begin serving on the Lawyers' Committee of the National Center for State Courts. Each of these groups is particularly interested in judicial speech issues.

I have read the response of [Petitioner] to the Letter of Inquiry in Nos. 06–0129–AP and 06–0130–AP before the Texas Commission on Judicial Conduct. In my opinion, his actions referred to in the Letter of Inquiry and described in the response, taken in connection with the nomination of Harriet Miers to be an Associate Justice of the United States Supreme Court, did not violate Canon 2(B) or Canon 5(2) of the Texas Code of Judicial Conduct. This affidavit is based on the Letter of Inquiry and [Petitioner's] response.

Canon 5(2) states in relevant part: "A judge or judicial candidate shall not authorize the public use of his or her name endorsing another candidate for any public office. . . ." In my opinion, Harriet Miers was not "another candidate for . . . public office" within the meaning of Canon 5(2). By "another candidate," the Canon refers to a candidate like "[a] judge or judicial candidate," that is, a political candidate for elected office. Ms. Miers was President Bush's nominee for a judicial position subject only to confirmation by the United States Senate. Furthermore, in commenting on Ms. Miers's background and experience, [Petitioner] was not "endorsing" her but was responding to legitimate press inquiries about her background and qualifications, matters of intense national interest and importance.

Canon 2(B) states in relevant part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others . . ." In my opinion, in commenting on Harriet Miers's qualifications to sit on the Supreme Court of the United States, [Petitioner] was not lending the prestige of his office in any respect. He was asked to comment, not because he *is a judge, but because he* has a long, close, public relationship with Ms. Miers. This is demonstrated, I think, by the fact that none of [Petitioner's] current colleagues on the Court were asked to make any comments about Ms. Miers during the confirmation process. The issue was not whether a judge [Petitioner] thought Ms. Miers was qualified for the position to which the President had nominated her, but whether [Petitioner], Harriet's friend, had unique information that would help the American public and, ultimately, the nation's 100 Senators decide whether she was qualified.

In legal parlance, [Petitioner] did not "thrust himself into the vortex" of this controversy. His extremely close relationship with Ms. Miers was well known in legal circles throughout Texas and in Washington, D.C. When reporters began searching for photographs of the significant milestones in Ms. Miers' professional career, [Petitioner] was invariably accompanying her or pictured very close by. There is simply no way he could have avoided being deluged with questions, and no way that his failure to cooperate with the press and with others could have been construed an anything other that a deliberate obstruction of the public's right to know about the President's appointee.

Nor was [Petitioner] in any way advancing his own private interests. His comments were about Ms. Miers, not himself. He never identified himself as a candidate for elected office or otherwise sought to draw attention to his own credentials and talents, as considerable as those are.

Moreover, because [Petitioner's] unique position, his statements about Ms. Miers' background and qualifications were not necessarily made to advance Ms. Miers' interests. As I have stated, his long and close friendship with Ms. Miers gave him an overriding responsibility to help the American public become better acquainted with her. What he said in his various interviews was no doubt viewed favorably by some and unfavorably by others; his comments worked to help her nomination in some quarters and worked to hinder it in others. Thus, the circumstances in which [Petitioner] found himself were highly unusual, perhaps unique in the history of the American judiciary. After all, [Petitioner] has not made a single public statement about Judge Alito or any prior Supreme Court nominee, nor, I suspect has he ever been asked to do so. But even if he had not been so close to Ms. Miers, and even if she had not been a

Judge Jim Parsons testified he was a district judge in Palestine and a long time Democrat. He did not believe Canon 5(2)'s restrictions on endorsements applied outside partisan electoral politics, and he viewed the public statements about Miers' nomination as "an administration of justice issue," particularly at the level involving a nominee to the United States Supreme Court, not a matter of partisan politics.[16]

Senator Arlen Specter, the Chairman of the Senate Judiciary Committee of the United States Congress, testified by deposition that the committee would have considered Miers' nomination to the United States Supreme Court had it not been withdrawn. If the Miers nomination had gone forward, his chief counsel would have recommended asking Petitioner to testify

before the committee and the Senator would have honored this recommendation. Senator Specter testified that frequently, judges appear and testify voluntarily in hearings involving nominees to the United States Supreme Court. The Senator saw no difference between speaking at the committee hearing and speaking informally to the press. He also stated that had Miers' nomination gone forward, his interest in Petitioner's testimony would have been based on Petitioner's personal and deep knowledge of Miers' background, not his position as a Texas Supreme Court Justice.

The parties stipulated that Geoffrey C. Hazard, Jr., Professor of Law at the University of Pennsylvania Law School, would testify Petitioner's speech

---

nominee for perhaps the most powerful governmental body in the world, I do not believe that his actions in speaking frankly and favorably about someone he knew would violate the Code of Judicial Conduct. Judges are frequently asked to introduce speakers or help present awards to people. In so doing, they inevitably must detail the subject's accomplishments and extol their virtues. I gave dozens of such speeches during my judicial service, sometimes in praise of individuals who were at the time candidates for higher office. For example, I gave farewell tributes in public ceremonies in the House of Representatives Chamber when Justices Cornyn and Abbott resigned from the Texas Supreme Court to stand for election as Attorney General. I did not endorse either person, but my remarks were intended to be laudatory and might have swayed a voter who chanced to be present. [Petitioner], as the senior justice of the state's highest court and as a gifted speaker, is frequently asked to make public remarks about a judge, a lawyer, or a community leader. I suspect that every judge in Texas has done likewise at some point or another during their tenure in office. As long as the judge does not make such remarks with the primary purpose of political gain for himself or the honoree, I do not think such conduct can be taken to violate the Texas Code of Judicial Conduct.

Finally, regardless of how the literal words of our Code might be interpreted, there are also larger constitutional questions at stake. In my opinion, [Petitioner's] actions described in the Letter of Inquiry and his response were protected by the First Amendment to the United States Constitution and by article I, section 8 of the Texas Constitution. His comments were directed to core issues of public importance. As such, his speech was protected under the rational set forth by the Supreme Court in *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).

16. Judge Parsons was also aware of the amicus curiae briefs filed by parties which he perceived might normally have competing interests. We have been assisted by briefs filed by the following: Texans for Lawsuit Reform; Donna G. Davidson and Tina J. Benkiser, Chairman of the Republican Party of Texas, on behalf of the Republican Party of Texas; a group of Texas lawyers including Travis E. Vanderpool, William Stephen Boyd, Orrin L. Harrison, Robert W. Jordan, Timothy W. Mountz, Joseph D. Jamail, Jr., Charles W. Schwartz, George E. Bowles, Jerry K. Clements, Michael M. Boone, Brian D. Melton, John L. Estes, Robert A. Wooldridge, George W. Bramblett, Jr., S. Michael McColloch, Wayne Fisher, Larry P. Boyd, and R. Jack Ayres; and The ACLU Foundation of Texas.

did not violate Canon 2B or 5(2) of the Texas Code of Judicial Conduct, and that [Petitioner] had a First Amendment right to engage in the speech which is subject of the censure by the State Commission on Judicial Conduct.

He would further say that judges talk to the media and public about nominees to the federal bench, and he is not aware of any judge who has been sanctioned by a state or federal committee or by a court for making comments to the press or public about a nominee to the federal bench.

The commission further stipulated that Blake Tartt would testify:

> [H]e is a former member of the Commission on Judicial Conduct, and a former president of the State Bar of Texas, and he has served on numerous ABA committees, which have vetted nominees for the federal bench, and in performing those tasks has frequently sought the comments of judges about the nominees. Many of these judges have made favorable comments in support of the nominees. . . .

## V.

■■■ The Texas Constitution and Government Code do not set forth expressly the commission's burden of proof. The parties assert and we agree that the commission has the burden of proof and that the standard is by a preponderance of the evidence, as is applicable "to the trial of civil actions generally." Tex. Gov't Code Ann. § 33.034(f) (Vernon 2004); *In re*

*Davis,* 82 S.W.3d 140, 142 (Tex. Spec.Ct.Rev.2002); *In re Bell,* 894 S.W.2d 119, 123 (Tex.Spec.Ct.Rev.1995); *In re Jimenez,* 841 S.W.2d 572, 579 (Tex. Spec.Ct.Rev.1992). Thus, the commission must prove each element of a charge by a preponderance of the evidence.

## VI.

■■■ The commission's first charge alleges that Petitioner violated Canon 5(2) when he "authorized the public use of his name and title to endorse his close friend, Harriet Miers, a candidate for public office." The question presented is whether the commission proved by a preponderance of the evidence that Petitioner authorized the public use of his name endorsing another candidate, Miers, for public office. We hold the commission did not.

Until 1974, there was no Code of Judicial Conduct in Texas. In 1974, the Texas Supreme Court enacted the initial Code of Judicial Conduct, which contained an "endorsement" prohibition:

> A judge or candidate for election to judicial office should not: . . . (b) make political speeches for a political organization or candidate or publicly *endorse* a candidate for public office.

Tex.Code Jud. Conduct, Canon 7A(1)(b), 37 Tex. B.J. 853 (1974).

In 1976, the Texas Supreme Court removed the endorsement prohibition from the Code.[17] In 1980, the Committee on Judicial Ethics[18] issued an opinion in answer to the question: "May a judge endorse a specific candidate or candidates?"

---

**17.** 40 Tex. B.J. 131 (1977); *see* Op. Tex. Att'y Gen. No. LO–89–21 (1989).

**18.** The Judicial Section of the State Bar of Texas created the Committee on Judicial Ethics in 1974. Robert P. Schuwerk & Lillian B. Hardwick. Handbook of Texas Lawyer and Judicial Ethics § 21.02 (Tex. Practice Series 2005). The committee issues advisory opinions. Both the committee and the commission agree the advisory opinions are not binding. *Id.* The commission rigidly adheres to the committee's advisory opinions. *Id.* The committee also does not knowingly make comments on pending or impending proceedings before the commission. *Id.*

The opinion stated the Code did not "specifically prohibit a judge from supporting a candidate or candidates." After reviewing the provisions of Canon 2, the opinion concluded:

> The Committee is of the opinion that endorsing a candidate or candidates is within the discretion of a judge provided the nature and type of endorsement does not contravene Canon 1, Canon 2A and Canon 2B of the Code of Judicial Conduct.

Comm. on Jud. Ethics, State Bar of Tex., Op. 53A (1980).

In 1990, the Texas Supreme Court amended Canon 7(3) as follows:

> A judge or judicial candidate shall not *authorize* the public use of his or her name endorsing another candidate for any public office, except that a candidate may indicate support for a political party.

TEX.CODE JUD. CONDUCT, Canon 7(3), 53 TEX. B.J. 240–41 (1990) (emphasis added).[19] Today, this provision (hereafter, "authorization" provision) is found in Canon 5(2) and provides in pertinent part: "A judge or judicial candidate shall not authorize the public use of his or her name endorsing another candidate for any public office, except that either may indicate support for a political party." TEX.CODE JUD. CONDUCT, Canon 5(2). Petitioner, who was on the Texas Supreme Court in 1990, testified that the "authorization" provision was generated at the request of the judges. In response to questions by the commission, Petitioner provided significant insights about the circumstances leading to the creation of the "authorization" provision:[20]

**19.** This provision was relocated twice, first in 1994 to Canon 5(3) and then in 2002 to Canon 5(2). TEX.CODE JUD. CONDUCT, Canon 5(3), 57 TEX. B.J. 1080 (1994); 65 TEX. B.J. 798 (2002). The language of this provision, however, remains unchanged from 1990.

**20.** Petitioner was the only witness called to testify about this provision. During his testimony, he responded to the suggestion of the commission's attorney that Canon 5(2)'s purpose was to eliminate corruption.

> Q. In canon 5(2) part of the reason that was created, Canon 5(2), you were talking earlier about being muscled or hustled into cross endorsing each other. It sounds to me like that's some sort of an anti corruption statute that goes to corruption.... [I]sn't there a quid pro quo problem that 5(2) addresses, where you do me a favor, and then one day I'll come to you and I'll ask a favor, and I better get it paid back. Isn't that part of what 5(2) was trying to address when it was created?
>
> A.... [T]hat may have been a small part of it, the cross, but this canon was brought to the Court by the judges, which is a very unusual thing, because judges don't like the canons, generally speaking, not for more of them, but for less of them, but they were for this one because they wanted—the principal reason was they wanted an excuse to give the mayor of the City Council person, mostly the county commissioners, so that they didn't get tangled up in politics.
>
> But it wasn't really corruption, it was just that the commissioners said, you know, I expect your endorsement. If you didn't give it, you were afraid what was going to happen to you at budget time. You're always fearful of what's going to happen to you at budget time. So it was not a corruption thing.
>
> I'm not aware of a corruption problem. I'm just not aware.
>
> Q. It's just a question I have regarding how the—how this was tailored. The question was, there does appear to be a fear about quid pro quo stopping this type of pressure on the judges regarding quid pro quo endorsements.
>
> A. I'm just not aware of the trading part. It was more, you give it to me or else I'm not going to give you what you want, your telephone budget, or your pencil budget is not—it's just what the Court is trying to use to operate. But there were problems, primarily it was in the country, although occasionally there would be problems in the more urban areas.
>
> But that was principally what—that's one of the problems. People bring you language, and it's aimed at a particular circumstance,

The problem, the reason that 5(2) was proposed in the first place, the judges were concerned that county officials were muscling them into endorsements that they didn't want to make. And they said, look, you've got to endorse me for, let's say a district judge, you have to endorse me for County Commissioner. The district judge didn't want to do it, but he didn't have any way of saying no. If he said no, then he was afraid of what was going to happen to him in the budgeting process. So he wanted cover for that. So that's why the judges came to us back in '88 and said, we're tired of getting hammered on here, and we want an excuse that we can hold up and say, we don't have to do this any more.

or even class of circumstances, but then the language can be used in circumstances that you don't immediately envision in ways that were never intended, and that's the problem you have there.

Petitioner testified further on this subject on examination by the commission:

Q. Do you believe that Ms. Miers was a candidate for public office in the sense of— that it was intended by the Texas Supreme Court in this canon?

A. No.

Q. And why not?

A. Well, because this canon, again as I said earlier, and Judge Parsons reiterated, is getting at the kind of entanglements, I wouldn't call it corruption, I suppose maybe there could be a case like that, but mostly it's the entanglements that you get into when you're getting involved in other people's elections.

And especially, well, no, not especially. I was going to say especially when they're in another branch. But the whole problem here was that judges were being asked to get involved in other people's races, and there was no way that you can get tangled up in endorsing a nominee for the Supreme Court of the United States. There's no entanglement to get into. There is no question. I'm not likely to be partial or impartial because of that endorsement, or any statement made in connection with that nomination. It just doesn't have any application in that situation.

In essence, Petitioner explained that the purpose of inserting the "authorization" language into Canon 5(2) was to provide "cover" for judges to refuse to authorize endorsements of partisan elected candidates.[21]

A Task Force has proposed certain amendments to the Code of Judicial Conduct. One proposed amendment to the language at issue in Canon 5(2) provides:

In order for a judge or judicial candidate to both appear to be and, in fact, be independent of political influence, a judge or judicial candidate shall not *endorse* another candidate for any public office and shall not *authorize* his or her name to be used in a manner where it

21. In effect, in 1990, members of the judiciary sought relief from a pressing political quagmire. On occasions, politically connected candidates would flex their "muscle" in order to "persuade" or pressure a judge to let the candidates show the judge as an endorser in an unrelated political contest. According to the conventional wisdom at the time, who better to show on a list of prominent endorsements than "the respected local judge." The supreme court acceded to the request, creating the "authorization" prohibition. The amendment addressed the specific problem head on by providing a safe harbor for the judge. The judge could now "reluctantly" decline to let a politically connected candidate use his name endorsing the candidate without fear of reprisal. The judge need only cite the "authorization" prohibition in the Code to resolve what could otherwise become a delicate and politically sensitive dilemma. Thus, the "authorization" prohibition had absolutely nothing to do with "endorsing," that is, making supportive political statements. Rather, it addressed a different situation: "cover." *The provision centered on customary "endorsements" so familiar to the voting public, that is, a compilation of well-known and respected persons who consented to the use of their names supporting a particular candidate.

Petitioner's testimony went unchallenged by the commission.

reasonably appears that the judge has endorsed another candidate for public office, except that either may indicate support for a political party. A judge or judicial candidate may attend political events and express his or her views on political matters in accord with this Canon, Canon 2 and Canon 3B(10).

*Final Report and Recommendations of the Supreme Court's Task Force on the Code of Judicial Conduct*, p. 21 (Jan.2005) (emphasis added). However, the Task Force's recommendation does not contain definitions of "endorse" and "authorize." [22]

We recognize it is integral to the commission's position that the "authorization" provision of Canon 5(2) be read and interpreted to prohibit a judge from "endorsing" or "supporting" another candidate. The commission's first charge contains no factual allegations Petitioner "authorized" the public use of his name endorsing Miers' nomination to the United States Supreme Court. The commission's evidence focused exclusively on establishing Petitioner had supported Miers' nomination. The commission urged this Court to hold that as Petitioner was a sitting Justice on the Texas Supreme Court and made public statements to the news media supporting Miers' nomination, Petitioner was guilty of endorsing another candidate, in violation of the "authorization" provision of Canon 5(2).

The commission primarily relies upon its own Public Statement PS–2000–2.[23] This Public Statement firmly espoused a broad view of the term "authorize." *See* PUBLIC STATEMENT, No. PS–2000–2 (Comm'n Jud. Conduct Mar. 24, 2000). The commission essentially declared "personally publishing an endorsement of another candidate for public office" was synonymous with "giving permission to or 'authorizing' the candidate or a third party to use the judge's name in such a public endorsement." *Id.* The commission took the position that no distinction was to be made "between acting on one's own behalf and empowering another to act on one's behalf as [Canon 5(2) ] necessarily encompasses the broadest definition of the term 'authorize.' " *Id.* The commission cited no legal precedent.

■ Thus, according to this Public Statement, the commission concluded that the "authorization" provision of Canon 5(2) prohibited a judge from "endorsing" another candidate. Before this Court, the commission took the additional step

---

22. The Task Force members' statements, while not precedential, are enlightening because they addressed—and failed to resolve—the very issues facing the Court today. They expressed grave concern that there is no definition for "endorsing" within the Texas canons and case law.

23. The commission was established by the Texas Constitution, article V, section 1–a(2). The constitution empowered the commission, inter alia, to discipline or censure any Justice or Judge for "willful or persistent violation of rules promulgated by the Supreme Court of Texas, incompetence in performing the duties of the office, willful violation of the Code of Judicial Conduct, or willful or persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public

discredit upon the judiciary or administration of justice." TEX. CONST. art. V, § 1–a(6). Clearly, the commission is the entity charged with enforcement of the Code. In addition, article V, section 1–a(10) provides:

> [T]he Commission may issue a *public statement* through its executive director or its Chairman at any time during any of its proceedings under this Section when sources other than the Commission cause notoriety concerning a Judge or the Commission itself and the Commission determines that the best interests of a Judge or of the public will be served by issuing the statement.

TEX. CONST. art. V, § 1–a(10) (emphasis added).

of defining "endorse" as "support."[24] Its pleadings and evidence demonstrate the commission uses these terms interchangeably and treats them as being synonymous. In effect, the commission has reinserted the heretofore rejected "endorsement" prohibition into Canon 5(2), thereby recasting the meaning of the "authorization" provision. In so doing, the commission has entirely ignored, if not dismissed, the importance of the pivotal term "authorized" in its pleadings, its evidence, and its arguments.

The issue before us is the construction of the "authorization" provision of Canon 5(2), including examining the meaning of "authorize." In our analysis of this issue, this Court recognizes the wisdom and value of the cautionary mandate incorporated within Canon 8A:

> The Sections are *rules of reason,* which should be applied consistent with constitutional requirements, statutes, other court rules and decisional law and in the context of all relevant circumstances.

Tex.Code of Jud. Conduct, Canon 8A (emphasis added). This provision also encourages "reasonable and reasoned application of the text." *Id.* Accordingly, we endeavor to construe Canon 5(2) as written, in accordance with the rules of reason.

■■ We also recognize our judicial system is based upon the cornerstones of integrity, impartiality, fairness, and independence. In discharging judicial responsibilities, the judge must be governed by the Rule of Law, conduct a fair and impartial hearing, and dispense justice as well as equity under the law, according to the particular facts and circumstances presented in each individual case.[25]

We therefore undertake to construe and apply the language in dispute in Canon 5(2) consistent with "rules of reason" to the facts presented. Our analysis should focus upon key language and its relationship to the entire Code.

■■■ Statutory construction is a question of law for the court. *Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex.1989). The primary rule in statutory interpretation is that a court must give effect to legislative intent. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 383 (Tex.2000). When determining legislative intent, we look to the language of the

---

24. The commission filed a First Amended Charging Document, stricken by this Court on other grounds, which alleged in part that Petitioner "authorized the public use of his name and title to 'support or endorse' his close friend, Harriet Miers, a candidate for public office...."

25. The commission, during its closing presentation, inexplicably injected the concept of "assembly line justice." The commission initially argued this Court should find Petitioner violated the Code. While skeptical of Petitioner's challenges of the Code, the commission acknowledged lurking problems and sought judicial assistance in interpreting the Code provisions at issue. The commission then argued: "The sad reality of this case is Petitioner, at the day of his hearing, was merely next. The worst thing you can be in a government proceeding is next, merely next in a series of others that were prosecuted for similar violations." The commission asked this Court to give it guidance, and, in the event it found the Code unconstitutional, to strike it down, in order that the commission could "get on with the business of regulating the rest of the conduct of the judges in the State." Counsel for Petitioner replied that Petitioner should not be treated as "merely next" as if within an "assembly line." He asserted that the commission totally ignored Canon 8 and the rules of reason, and that Petitioner was "being sanctioned for speaking truthful speech on a matter of public importance that is core speech in our democracy...." Assembly line justice is a close cousin to no justice at all, and is, in reality, an absurd oxymoron. Assembly line justice should be foreign to a judge's vocabulary and an extinct concept in our democracy.

statute, as well as its legislative history, the objective sought, and the consequences that would flow from alternate constructions. *Id.* When interpreting a statute, we read words and phrases in context and construe them according to the rules of grammar and common usage. TEX. GOV'T CODE ANN. § 311.011(a) (Vernon 2005). Words are given their ordinary meaning. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 866 (Tex.1999). Legal or other well-accepted dictionaries are a method of determining the ordinary meaning of certain words. *See Pratt–Shaw v. Pilgrim's Pride Corp.,* 122 S.W.3d 825, 833 (Tex.App.-Dallas 2003, pet. denied). In construing a statute, we give effect to all its words and, if possible, do not treat any statutory language as mere surplusage. *Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.,* 19 S.W.3d 393, 402 (Tex.2000). This Court must give effect to the word "authorize" to prevent it from being surplusage. *See Meritor Auto., Inc. v. Ruan Leasing Co.,* 44 S.W.3d 86, 89 (Tex.2001). We may not disregard, discount, or dismiss this language and its impact.

If the supreme court had intended by its 1990 amendments to reinstate the 1974 "endorsement" prohibition, it would have done so, but it did not. Instead, it used substantially different language by adding the "authorization" provision. We conclude the Texas Supreme Court intended for the 1990 amendment inserting the "authorization" provision into the Canon governing political activity to effect a substantial change, not simply a technical refinement, from the "endorsement" prohibition. *See Gold v. City of Coll. Station,* 40 S.W.3d 637, 649 (Tex.App.-Houston [1st Dist.] 2001, pet. granted, judgm't vacated w.r.m. by agr.) ("Moreover, the fact that the legislature enacts an amendment indicates that it thereby intended to change the original act by creating a new right or withdrawing an old one."). Such a significant modification in terminology (deleting "endorse" and inserting "authorize") and the concomitant shift in meaning certainly signals that the Texas Supreme Court intended to confine the restriction to a prohibition of a judge's *authorization* of the public use of his or her name endorsing a candidate.

■ In determining what constitutes a judge's *authorizing* the public use of his or her name endorsing a candidate for any public office, we examine a recent incident involving such conduct. A judge's act of giving a candidate express permission to include the judge's name on a publicly distributed list of persons endorsing the candidate would violate Canon 5(2). *See Public Admonition of Justice of the Peace Torres,* No. 00–0689–JP (Comm'n Jud. Conduct Aug. 16, 2000). Any other fact scenario must be analogous to this situation to constitute a violation of Canon 5(2). That is, the facts must show the judge gave permission for others to publicly use the judge's name in endorsements of the candidate.

Several other states' Code provisions treat the use of a judge's name separately from endorsing or making public statements. In the Oregon Code of Judicial Conduct, JR 4–101(1) and (3) of Oregon's Code provide, in part, that:

> [a] judge shall not knowingly (1) make a public statement in support of the election or defeat of any candidate for a nonjudicial public office ..., or (3) lend the judge's name in support of an action, by any person or group, to elect or defeat any candidate for a nonjudicial public office....[26]

OR.CODE JUD. CONDUCT JR 4–101(1), (3). Oregon's Code provisions, which apply to

---

**26.** In its entirety, JR 4–101 provides:

A judge shall not knowingly (1) make a

candidates for nonjudicial offices, distinguish between public statements supporting or opposing a candidate and lending the judge's name supporting such candidates. The "authorization" provision of the Texas Code and the "lending" provision of the Oregon Code address the same conduct, albeit in different words.

In *In re Raab*, 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287 (2003),[27] several sections of the New York Code of Judicial Conduct related to prohibited political activity were at issue. One prohibited "permitting his or her name to be used in connection with any activity of a political

> public statement in support of the election or defeat of any candidate for a nonjudicial public office or to promote or influence the passage or defeat of laws or regulations at any level of government, or (2) contribute or solicit funds services or property to elect or defeat any candidate for a nonjudicial public office or to promote or influence the passage or defeat of laws or regulations at any level of government, or (3) lend the judge's name in support of an action, by any person or group, to elect or defeat any candidate for a nonjudicial public office or to promote or influence the passage or defeat of laws or regulations at any level of government,
> if in doing (1), (2) or (3) above, the judge:
> (A) Creates a reasonable doubt about the judge's impartiality toward persons, organizations or factual issues that would likely come before the court on which the judge serves, including, but not limited to, circumstances that require the judge's disqualification under JR2–106.
> (B) Supports in the judge's official capacity, a cause other than one pertaining to the legal system, legal education, the improvement of the law, the integrity of the judicial process, the administration of justice, or court administration, including judicial benefits. This subsection does not limit the ability of a judge to join, pay dues to, and participate in activities of any professional association or organization, which activities may include lobbying for judicial benefits such as salary and retirement.
> (C) Represents that the judge making the public statement speaks on behalf of the

organization"; the other prohibited "publicly endorsing or publicly opposing (other than by running against) another candidate for public office." *Id.* at 1289 n. 2. The New York Code clearly distinguished between a judge permitting the use of his name and a judge endorsing another candidate. The plain language of the New York Code provisions shows that one relates only to the use of the judge's name and the other to "endorsing." The former provision, however, does not encompass the latter. The New York Code's prohibition relating to the use of a judge's name is similar to the Texas Code's "authorization" provision.

> judicial branch of government unless the judge has been authorized to do so.
> OR.CODE JUD. CONDUCT JR 4–101.

27. The conduct in question included "an improper contribution" and "actively campaign[ing] for a legislative candidate by participating in a phone bank and assist[ing] Working Families Party officials at a candidate screening meeting by questioning other judicial and nonjudicial candidates on behalf of the party." *Raab*, 763 N.Y.S.2d 213, 793 N.E.2d at 1293. Several of the relevant canons included: "Prohibited political activity shall include: ... (c) engaging in any partisan political activity (except as to own campaign); (d) participating in any political campaign for any office or permitting his or her name to be used in connection with any activity of a political organization; (e) publicly endorsing or publicly opposing (other than by running against) another candidate for public office; (f) making speeches on behalf of a political organization or another candidate; and (g) attending political gatherings." *Id.* at 1289 n. 2. Both the conduct and the relevant provisions of the New York Code are clearly distinguishable from Petitioner's conduct and the Texas Code. The commission extracted from this case an excerpt referring to political corruption. We observe that there is not even a hint of corruption in the case before us. In fact, the commission admitted that it did not contend the statements at issue were false or deceptive.

In 1989, the Committee on Judicial Ethics recommended to the Texas Supreme Court that the Code be amended to specifically prohibit a judge or a candidate for election to judicial office from publicly endorsing a candidate for public office. As previously noted, in 1990, the Texas Supreme Court amended the Texas Code to add the "authorization" provision but did not add a prohibition on "endorsing" per se.

The recommendation of the recent Task Force proposes amending Canon 5(2) by prohibiting "authorizing" and "endorsing" as separate acts. The recommendation does not equate "authorize" and "endorse." It does not propose to subsume the meaning of "authorize" into the meaning of "endorse." It does not eliminate the former in favor of the latter. Instead, it clearly identifies each as a separate act, and it prohibits each act. Thus, the recommendation of the recent Task Force reinforces our interpretation of Canon 5(2).

The Texas Supreme Court defines "authorized" as follows: "The primary meaning of 'authorize' is to empower, or give a right to act." *Caller Times Publ'g Co. v. Chandler*, 134 Tex. 1, 7, 130 S.W.2d 853, 856 (1939); *see Cox, Inc. v. Humble Oil & Ref. Co.*, 16 S.W.2d 285, 286 (Tex. Comm'n App.1929, judgm't adopted) (same). Other courts have defined the empowerment of authorization as referring to future conduct. For example, in *Gray v. Gill*, 125 Misc. 70, 210 N.Y.S. 658, 660 (N.Y.Sup.Ct. 1925), "authorize" was defined as "to permit a thing to be done in the future." The court contrasted the term with "approve," which it defined as "to ratify or confirm a thing already done, or to sanction a thing

that *may* be done in the future...." *Id.* (emphasis added). Thus, as the *Gray* court observed, "After the act, one may not authorize it, although he may approve it." *Id.* "Authorize," therefore, has an accepted legal meaning. The term "authorize" is also defined to mean "to give legal authority; to empower" and "to formally approve, to sanction." BLACK'S LAW DICTIONARY 143 (8th ed.2004). These legal definitions of "authorize" essentially require that the authorization be express and refer to conduct or actions to be taken in the future. The language of giving legal authority, empowering, formally approving, requiring, and sanctioning all necessitate affirmative actions on the part of the authorizor. Thus, it is not sufficient under Canon 5(2) for a judge simply to speak; the judge must affirmatively "authorize the use of his name," that is, expressly permitting the use of his name in the future. The commission's interpretation has deviated from the plain meaning of the "authorization" provision in Canon 5(2). The commission's interpretation does not merely take a broad view of "authorize," it eliminates this element entirely.

When the commission called Petitioner as its only witness, the commission never asked Petitioner if he "authorize[d] the public use of his ... name endorsing" Miers' nomination. In addition, the commission failed to question Petitioner about this matter at the hearing before the commission. The commission's questions to Petitioner recognized he had no control or authority over what the media broadcast or printed.[28] In the media interviews, Petitioner could anticipate the use of his

---

28. The commission's attorney asked Petitioner,

Q. Now, when you were giving these interviews, you knew you couldn't control what they would write about?

A. Absolutely.

* * *

Q. ...When it goes out, it's out, you cannot control the media, right?

A. Absolutely.

name as the person being interviewed, if the media chose to identify him. However, having reviewed Petitioner's statements, we do not find any evidence that he authorized the media to use his name publicly endorsing Miers.[29] Any argument that Petitioner impliedly authorized the public use of his name endorsing Miers would be futile and unavailing.[30] We therefore conclude the commission failed to prove by a preponderance of the evidence that Petitioner *authorized* the public use of his name endorsing Miers.

## VII.

While we have rejected the commission's argument that Canon 5(2) prohibits "endorsing," we conclude that, even under its construction, the commission failed to prove by a preponderance of evidence that Petitioner's public statements endorsed Miers.

Again, the first task is to define the key term. We, therefore, focus on a definition of "endorsing." The Code provides no definition. The commission concedes there is no definition or consensus as to the meaning of "endorse" in Canon 5. The Code of Judicial Conduct in its past and present forms, the Task Force Recommendations,[31] and the relevant statutes fail to define "endorse." The commission's judicial disciplinary proceedings, the advisory opinions of the Committee on Judicial Ethics, and the few available decisions of the Texas courts also fail to define "endorse" under Canon 5(2). Absent any definition of the term "endorsing," we are presented with the task of statutory interpretation.

The commission's brief[32] essentially contends Petitioner's public statements provided more than "factual information about Miers' background and experience." Specifically, the commission stated: "[Petitioner's] praise of Miers' 'sterling' character and his opinion that she would make 'a great justice,' and his repeated public statements that her nomination was 'good' and 'solid,' certainly sound like approval and support of the President's nomination." In a footnote, the commission refers us Merriam–Webster OnLine Dictionary's definition of "endorse": "[T]o approve openly, especially: to express support or approval of publicly and definitely [as in] endors[ing] a mayoral candidate." The commission's ultimate argument is that "endorsement" is equivalent to "support," and it is undisputed that Petitioner supported Miers.

Petitioner served the commission with an interrogatory asking the commission to explain what constitutes an "endorsement." In its response, the commission stated the term was not defined in the Code and should be given its "ordinary and reasonable meaning" as contained in the American Heritage Dictionary of the

---

**29.** While the commission listed members of the news media as potential witnesses, none were called. The commission called no witnesses other than Petitioner.

**30.** We do not suggest the commission advanced this position. As previously noted, the commission cast a blind eye to the "authorized" requirement and never proffered any argument or evidence on this subject.

**31.** The Task Force hearings on the Code also reflect some insightful remark: and observations of distinguished Professor Laycock and

Dean Attanasio as to the broad nature of the term "endorse" and what, if any, distinctions can be drawn between "support" and "endorse." Their concerns, shared by other members of the committee, related to interpreting the language in order to conform to the rules, and to determining whether the terminology would pass constitutional muster.

**32.** The commission's brief provides this Court with approximately one page of analysis on its position.

English Language, Fourth Edition, 2000, "which defines 'endorse' " as: "to give approval of or support to, especially by public statement; sanction: endorse a political candidate."

With respect to the commission's position equating "support" and "endorse" and its assertion that Canon 5(2) embraces a blanket prohibition of endorsing, we consider two advisory opinion from the Committee on Judicial Ethics. The committee's opinion No. 2 contain the following question and answer:

> **QUESTION:** May a Texas judge privately introduce candidates for judicial office to his friends and recommend that such friends vote for such candidates?
>
> **ANSWER:** It is the opinion of the Committee on Judicial Ethics that a Texas judge would not violate the Code of Judicial Conduct by privately introducing candidates for judicial office to his friends and recommending that such friends vote for such candidates.

Comm. on Jud. Ethics, State Bar of Tex., Op. 2 (1975). In its opinion No. 13, the committee stated,

> **QUESTION:** May a district judge introduce a candidate for the state Legislature to his personal friends and recommend that such friends vote for such candidate?
>
> **ANSWER:** The Committee on Judicial Ethics is of the opinion that the question should be answered in the affirmative. In Opinion Number 2 this Committee held that a Texas judge would not violate the Code of Judicial Conduct by privately introducing candidates for judicial office to his friends and recommending that such friends vote for such candidates. The Committee now reaffirms that opinion and extends its scope so that henceforth it will be applicable to all candidates for public office.

Comm. on Jud. Ethics, State Bar of Tex., Op. 13 (1976).

These ethics opinions are noteworthy for several reasons. These opinions do not conclude that "endorsing," as a matter of principle, is evil, corrupt, ill-advised, undignified, or inherently injudicious. Both opinions hold "endorsing" is acceptable conduct within certain boundaries. These holdings are consistent with, if not as expansive as, the new draft rules of the American Bar Association's joint commission [33] and a significant number of state Codes throughout the country that expressly permit judges to endorse other candidates in certain circumstances [34] or

---

**33.** We take notice that "[i]n late January 2005, the American Bar Association's joint commission released new draft rules on political activity by judges and judicial candidates which is covered in Canon 5 of the existing code. The draft revisions specifically address the activities of candidates seeking judicial office in partisan public elections." The new draft rules permit candidates to "publicly endorse or oppose candidates running for other judgeships in the same judicial office." *N.D. Family Alliance, Inc. v. Bader*, 361 F.Supp.2d 1021, 1041 n. 2 (D.N.D.2005).

**34.** The Code of Judicial Conduct in a number of states permit endorsing. For example,

In California, Canon 5A(2) provides:

> 5A. Judges and candidates for judicial office shall not ... (2) make speeches for a political organization or candidate for nonjudicial office or publicly endorse or publicly oppose a candidate for nonjudicial office;

the comment to Canon 5A states that:

> Under this Canon, a judge may publicly endorse another judicial candidate. Such endorsements are permitted because judicial officers have a special obligation to uphold the integrity and impartiality of the judiciary and are in a unique position to know the qualifications necessary to serve as a competent judicial officer.

In addition, Canon 5C states:

> Candidates for judicial office may speak to political gatherings only on their own be-

which have no express prohibitions.[35]

In addition, these ethics opinions contradict the assertion that the "authorization" provision of Canon 5(2) constitutes a blanket prohibition, banning a judge from endorsing another candidate. These opinions only limit "endorsing" in scope. In effect, these opinions approve the practice of "endorsing" by allowing a judge to introduce a candidate to personal friends

> half or on behalf of another candidate for judicial office.

CAL.CODE JUD. CONDUCT, Canons 5A(2) & cmt., 5C.

Idaho's Code of Judicial Conduct states:

> (1) A judge or a candidate subject to public election may, except as prohibited by law:
> (a) when a candidate for election . . .
> (iv) publicly endorse or publicly oppose other candidates for the same judicial office in a public election in which the judge or judicial candidate is running.

IDAHO CODE JUD. CONDUCT, Canon 5C(1)(a)(iv).

In Illinois, Canon 7B states:

> (1) A judge or candidate may, except as prohibited by law: . . .
> (b) when a candidate for public election . . .
> (iv) publicly endorse or publicly oppose other candidates in a public election in which the judge or judicial candidate is running.

ILL.CODE OF JUD. CONDUCT, Canon 7B(1)(b)(iv).

In Kansas, Canon 5C states:

> (1) A judge or a candidate subject to public election may, except as prohibited by law: . . .
> (b) when a candidate for election . . .
> (iv) publicly endorse or publicly oppose other candidates for the same judicial office in a public election in which the judge or judicial candidate is running.

KAN.CODE JUD. CONDUCT, Canon 5C(1)(b)(iv).

In Maine, Canon 5(C)(2)(d) states:

> A candidate for election or reelection as judge of probate may, while a candidate, publicly endorse or publicly oppose any candidate for public office.

ME.CODE JUD. CONDUCT, Canon 5(C)(2)(d).

Michigan's Code of Judicial Conduct provides that:

> (2) A judge or candidate for judicial office may: . . .
> (a) attend political gatherings;
> (b) speak to such gatherings on the judge's own behalf or on behalf of other judicial candidates. . . .

MICH.CODE OF JUD. CONDUCT, Canon, 7A(2)(a), (b).

In North Carolina, a judge or judicial candidate may:

> (2) if [a judge] is a candidate, endorse any individual seeking election to any office or conduct a joint campaign with and endorse other individuals seeking election to judicial office, including the solicitation of funds for a joint judicial campaign. . . .

N.C.CODE JUD. CONDUCT, Canon 7B(2).

In North Dakota, the commentary to Canon 5 states that the "canons do not prohibit candidates from campaigning on their own behalf or from endorsing or opposing candidates for a position on the same court for which they are running." N.D.CODE OF JUD. CONDUCT, Canon 5A, Commentary, para. 4.

In Pennsylvania, Canon 7A states:

> (2) Judges holding an office filled by public election between competing candidates, or a candidate for such office, *may*, only insofar as permitted by law, *attend political gatherings, speak to such gatherings on their own behalf when they are a candidate for election or reelection, or speak on behalf of any judicial candidate for the same office,* identify themselves as a member of a political party, and contribute to a political party or organization.

PA.CODE JUD. CONDUCT, Canon 7A(2) (emphasis added).

In Tennessee,

> [a] judge, subject to retention election, may, at any time, publicly endorse or oppose a judge standing for retention or a candidate for appointment to the court of which the judge is a member.

TENN.CODE OF JUD. CONDUCT, Canon 5D.

Vermont has a similar provision which states that a candidate for election or reelection as judge of probate or assistant judge may, while a candidate "publicly endorse or publicly oppose any candidate for the same office." VT. CODE OF JUD. CONDUCT, Canon 5C(2).

**35.** For example: Alabama and Oregon. The Oregon Code prohibits a judge from making public statements and lending the judge's name *in relation to other candidates* who are running for nonjudicial office, but makes no mention of a similar prohibition with respect to candidates for judicial office. OR.CODE OF JUD. CONDUCT, JR 4–101 to 4–104.

and recommend to friends that they vote for the candidate.[36]

The text of Canon 5(2), the lack of any definition of the term "endorse," and the problematic ethical opinions provide marginal guidance. A survey of the respective Codes of a majority of states shows that they prohibit either "endorsing"[37] or "endorsing and opposing,"[38] but for the most part these state Codes fail to define "endorse."

Ohio's Canon 7(B)(2)(b) prohibits a judge or judicial candidate from publicly endorsing or opposing a candidate for another public office. OHIO CODE JUD. CONDUCT, Canon 7(B)(2)(b). The Ohio Board of Commissioners referred to a dictionary for broad direction in defining the term "endorsing." The Ohio Board ultimately defined "endorsement" as: "to give approval of or support to." Ohio Bd. of Comm'rs on Grievances & Discipline, Op. 89–15 (Apr. 10, 1992) (citing WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY (1984)).

The definitions provided by two leading dictionaries, however, require more than mere support. Webster's International Dictionary defines "endorse" as "to express definite approval or acceptance of," "support or aid explicitly by or as if by a signed statement," "vouch for," and "underwrite." WEBSTER'S THIRD NEW INT'L DICTIONARY 749 (1981). The Oxford English Dictionary defines "endorse" as "[t]o write on the back of something," "[t]o con-

firm, sanction, countenance, or vouch for (statements, opinions, acts, etc.; occasionally persons) as by an endorsement," and "[t]o declare one's approval of." 5 THE OXFORD ENGLISH DICTIONARY 233 (2d ed.1989). Even the commission's proffered definition of "endorse" from the Merriam–Webster's Online Dictionary indicates the term involves more than mere support: "to express support or approval of publicly and definitely <endorse a mayoral candidate>." MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com/dictionary/endorse.

North Carolina's definition of "endorse"—requiring more than mere support—is consistent with these definitions. North Carolina's Code of Judicial Conduct, the only Code that we determined actually defined "endorsing," provides that a judge who is a candidate may endorse a candidate for judicial office. N.C.CODE JUD. CONDUCT, Canon 7B(2). The North Carolina Code of Judicial Conduct defines "endorse" as follows:

*knowingly and expressly request, appeal or announce publicly,* orally or in writing, whether in person or through the press, radio, television, telephone, Internet, billboard or distribution and circulation of printed materials, *that other persons should support a specific individual in his efforts to be elected to public office.*

N.C.CODE JUD. CONDUCT, Canon 7A(3) (emphasis added).[39] North Carolina has rec-

---

**36.** In a less populated area, everyone in the community may qualify as the judge's "friend." In a larger area, even given that the audience may initially be limited to several thousand persons, the post-endorsement wave of activity by the judge's friends generated by the initial endorsement may well increase exponentially to very sizeable numbers.

**37.** For example, Arizona, Colorado, Connecticut, Georgia, Massachusetts, New Hampshire,

New Jersey, New Mexico, North Carolina, Pennsylvania, and Utah.

**38.** For example, Arkansas, Delaware, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Minnesota, Nebraska, Nevada, New York, Ohio, Rhode Island, South Carolina, Vermont, Virginia, West Virginia, and Wyoming.

**39.** North Carolina's Code of Judicial Conduct also defines "candidate," limiting its meaning to "a person actively and publicly seeking

ognized "endorsing" as a term of art within the political process.

Although *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), is frequently relied upon in First Amendment cases for a number of significant principles, it is important in this case because of the basis for its decision, a statutory provision of an election code. The former provision of the California Elections Code at issue in *Eu v. San Francisco County Democratic Central Committee,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989), stated in part that the official governing bodies of the political parties "shall not *endorse, support,* or oppose, any candidate for nomination by that party for partisan office in the direct primary election." *Id.* at 217, 109 S.Ct. 1013 (emphasis added). This election code clearly distinguished between "endorse" and "support" because the use of both terms would be redundant.

■■■ The language and legal effect of a statute may require a court to construe it "strictly." To construe a statute strictly means applying a limited, narrow, or inflexible reading and application of the statute. *Cain v. State,* 882 S.W.2d 515, 519 (Tex.App.-Austin 1994, no writ). A strict construction of a statute must be applied to two classes of statutes: those that authorize a penalty and those that infringe upon private property or *liberty interests. Id.* A statute that falls within one of these categories must be couched in such explicit terms that the party upon whom the statute is to operate may, with reasonable certainty, ascertain what the statute requires to be done and when it must be done. *Mo., K. & T. Ry. Co. v. State,* 100 Tex. 420, 424, 100 S.W. 766, 767

(1907). If such explicit terms are not present, there is no opportunity for a person charged with the duty to protect himself by the performance of it according to the law. *Id.* When the liberty interest is the right to core political speech, that construction must be quite strict.

■■■ The commission alleged that Petitioner violated Canon 5(2) when he made certain statements in support of Harriet Miers, a United States Supreme Court nominee at the time. Debate on the qualifications of candidates for public office is at the core of our electoral process and of First Amendment freedoms. *Eu,* 489 U.S. at 223, 109 S.Ct. 1013. The Supreme Court has recognized repeatedly that debate on the qualifications of candidates is integral to the operation of the system of government established by the Constitution. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Because the authorization provision of Canon 5(2) implicates the liberty interest of free expression, the Canon must be strictly construed in favor of Petitioner. *See Mo., K. & T. Ry. Co.,* 100 Tex. at 424, 100 S.W. at 767.

The commission and the Ohio Board define "endorsing" as meaning "support"; other prominent dictionary definitions and the North Carolina Code of Judicial Conduct define "endorsing" as meaning more than just support. This latter definition constitutes a "limited, narrow, and inflexible reading and application" of the term "endorsing" in Canon 5(2) of the Code. The former interpretation encompasses Petitioner's statements; the latter does not. We do not propose to construct our own definition of "endorsing." We do, however, recognize the necessity of first estab-

election to judicial office." N.C.CODE JUD. CONDUCT, Canon 7A(1). Had the Texas Supreme Court defined "candidate," "endorse,"

and other terms in the Texas Code of Judicial Conduct, many of the questions before us would not have arisen.

lishing the meaning of "endorsing" before we can proceed to determine whether Petitioner's statements constitute "endorsing." This step is fundamental, particularly when the only definition specifically mandated by a state Code, that of North Carolina, which in turn is based upon the American Bar Association's Model Code of Judicial Conduct, would not prohibit Petitioner's statements.

 Accordingly, we interpret "endorsing" under the circumstances of this case to mean more than support, that is, more than spoken praise.

Petitioner testified his public statements, while obviously supportive, principally dealt with factual background and did not urge the public to "get behind" the nominee, particularly because the situation involved a nomination to the federal bench, not a candidate running in a contested election.

The federal judicial-selection process focuses only on the individual nominated for the judicial position. The inquiry carefully examines the nominee's character, credentials, qualifications, and experience. The process encourages and invites public comment from prominent members of the community, including the judiciary. Public statements made about the nominee are not intended to give an individual an advantage over another because there is only one nominee. Senator Specter testified that the Senate Judiciary Committee would have requested Petitioner to appear and testify at hearings on Miers' nomination. Petitioner testified he would have repeated the same public statements at issue here at such a hearing.[40]

Petitioner touched on this aspect again when he testified that "of course you're endorsing in the sense that you're supportive, but that's not what the canon means." He stated his intent was to get the truth out because much of the information being published about Miers was negative and untrue. He declined the commission's invitation to describe his support as "go, Harriet, go, she is my pick," instead emphasizing he predominantly conveyed in-

---

**40.** Our review of a portion of the evidence shows numerous statements made by prominent jurists before the Senate Judiciary Committee supporting previous judicial nominees to the United States Supreme Court. Utah State Judge Lindberg described her "enthusiastic support" for Judge Roberts nomination as Chief Justice and went into detail about his "towering intellectual skills and engaging personality." Judge Klein, Presiding Justice of the California Court of Appeals, spoke in behalf of Judge O'Connor, whom she found "exceptionally well qualified" as well as "brilliant, fair, pragmatic...." She described her integrity as being "above reproach," and emphasized she was moderate and "gracious" and had "every potential for becoming an outstanding Supreme Court Justice." United States District Judge Jack Tanner described Judge Thomas as "well qualified to become an Associate Justice" and "the best man for the job." United States District Judge "endorse[d] wholeheartedly the nomination[s]" of Judge Powell and William Rehnquist. He praised Mr. Rehnquist for his academic achievements and professional skills and "could find no one that [he] would recommend more highly." United States Court of Appeals Judge Barry, of the Third Circuit in Pennsylvania, said Judge Alito was "a man of remarkable intellectual gifts" and "impeccable legal credentials" who would make a "marvelous and distinguished" Associate Justice.

A careful review of the public statements of judges who appeared before a Senate Judiciary Committee shows each witness' testimony more often than not "endorsed," by any definition, the nominee.

According to Professor Hazard, whose testimony was stipulated to by the commission: "[J]udges talk to the media and public about nominees to the federal bench, and he is not aware of any judge who has been sanctioned by a state or federal committee or by a court for making comments to the press or public about a nominee to the federal bench."

formation about her personal and professional background, the type of cases she handled (general business litigation from contracting disputes to antitrust and securities), and the positions she took when a Dallas City Council member or State Bar of Texas President. He stressed that he intended to accurately relate her qualifications.

Petitioner further testified he was present during the discussions that took place when the Canons were amended in 1990: "[T]here was not the slightest thought that it would ever apply to comments made in respect to a nomination to the United States Supreme Court. That was not a concern, it never crossed anybody's mind, and it hasn't since until this case." The amendment concerned providing "cover" for the judges under totally different circumstances.

■■■ The commission highlights statements by Petitioner that Harriet Miers "would make a good justice," has a "sterling character," and her nomination was "good" and "solid." These and other

statements reflect that Petitioner provided descriptions of Miers' background, his perception of her personal views on various subjects, and his favorable opinions about Miers' nomination to the bench. They do not constitute "endorsing" in that they are no more than support or praise, and they do not constitute a request or appeal for others to support her nomination.

Our conclusion is reinforced by examining Petitioner's public statements in the context of several relevant provisions of the Canons.[41] The Preamble and Canon 2 stress the need for a competent judiciary and maintaining public confidence. Petitioner made a number of remarks which asserted Miers' character, experience, and career reflected the type of competence necessary on the bench. His remarks were designed to instill public confidence in the Miers nomination.

Canons 3B(10), 4B(1), and 5(2) encourage participation by judges in the legal system, the administration of justice, and the political process. Petitioner's public

---

41. The Preamble of the Code stresses the principle that "an independent, fair and competent judiciary will interpret and apply the laws that govern us." It also emphasizes judges "must respect and "the judicial office as a "public trust." Tex. Code Jud. Conduct, Preamble.

Canon 1 states: "A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective." Tex. Code Jud. Conduct, Canon 1.

Canon 2 states a judge must "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Id. Canon 2. Canon 3B(10) states in part that a judge is not prohibited from "making public statements in the course of their official duties or from explaining for public information the procedures of the court." Tex. Code Jud. Conduct, Canon 3B(10).

Canon 4B(1) states that a judge may "speak, write, lecture, teach and participate in extra-judicial activities concerning the law, the legal system, the administration of justice and non-legal subjects, subject to the requirements of this Code...." Tex. Code Jud. Conduct, Canon 4B(1).

Canon 5(1)(ii) states: "A judge ... shall not: ... knowingly or recklessly misrepresent the identity, qualifications, present position, or other fact concerning the candidate or an opponent...." Tex. Code Jud. Conduct, Canon 5(1)(ii). Canon 5(2), in its entirety, states: A judge or judicial candidate shall not authorize the public use of his or her name endorsing another candidate for any public office, except that either may indicate support for a political party. A judge or judicial candidate may attend political events and express his or her views on political matters in accord with this Canon and Canon 3B(10). Tex. Code Jud. Conduct, Canon 5(2).

statements concerning Miers' nomination detailed her personal life, her positions on various sensitive issues, her professional career, her character, and her work ethic. It is undisputed that Canon 5(2) permits a judge to speak out "on political matters." Petitioner's statements were within the boundaries of these Canons. The commission's interpretation and application of the authorization provision minimizes Canon 5(2)'s provision empowering a judge to speak on political matters.

Canon 5(1)(ii) prohibits misrepresentations. Petitioner took the position that he "was uniquely situated to get the truth out about Harriet [Miers]." He described the times as truly "chaotic" and that "the publicity coming out about Harriet Miers [was] negative," "false," and "untrue." He perceived that "more information" needed to be developed about her background. His public statements were "truthful" on matters "of enormous concern to the American public." Petitioner was also "worried" that if he did not speak up, it could be perceived that he knew something that would hurt her nomination, which was false.

■ Canon 5(2) should permit a judge to respond to any untruthful or inaccurate statements, thereby affording a judge able and willing to do so an effective and timely avenue of recourse to correct misrepresentations in a public forum. Otherwise, this provision provides minimal utility at such a critical juncture. A construction of this provision that bars a judge from publicly responding to misrepresentations absent express permission to do so leaves a judge vulnerable to potentially inaccurate and untruthful attacks without any effective remedy and deprives the public of correct and accurate background information on judicial candidates and nominees. A reasonable construction of this provision affords an immediate and practical method to counter public attacks and criticisms and protects the public's right to truthful and important information, particularly as to a nominee to the United States Supreme Court. In addition, the purposes of the Code are promoted and enhanced, not hindered and frustrated. This provision should not censor or silence a judge.

The American Bar Association Model Code of Judicial Conduct and other state Codes make ample provision enabling a judicial candidate to respond to misrepresentations. The ABA Model Code of Judicial Conduct includes a comment addressing "false information" stating, "Where false information concerning a judicial candidate is made public, a judge or another judicial candidate having knowledge of the facts is not prohibited by Section 5A(1) from making the facts public." ABA MODEL CODE JUD. CONDUCT, Canon 5A(1), Commentary (2004). This comment or a variation of this comment has been included in the Codes of Judicial Conduct of several states including Alaska, Florida, Idaho, Indiana, Kansas, Kentucky, Mississippi, Nebraska, Nevada, North Dakota, South Carolina, South Dakota, and Tennessee. We conclude Petitioner's public statements are consistent with a judge's right, if not his responsibility, to respond to misrepresentations.

We conclude the commission's efforts to postulate judicial misconduct by showing a state appellate judge made public statements about a pending nominee to the United States Supreme Court, in the commission's words, "endorsing," under the particular facts and circumstances of this case, severely strain a reasonable construction of the Texas Code and are without merit.

We conclude the commission has failed to prove by a preponderance of the evidence that Petitioner endorsed Miers. We conclude under the particular circum-

stances presented that Petitioner complied with the spirit and letter of the Texas Code of Judicial Conduct. Accordingly, we conclude Petitioner is not guilty of violating Canon 5(2).

## VIII.

█ The commission's second charge alleges: "[Petitioner] lent the prestige of his judicial office to advance the private interests of his close friend, Harriet Miers in violation of Canon 2B of the Texas Code of Judicial Conduct." We conclude Canon 2B is inapplicable to the conduct at issue.

Canon 2 is entitled: "Avoiding Impropriety and the Appearance if Impropriety in All of the Judge's Activities." TEX.CODE JUD. CONDUCT, Canon 2. Canon 2B of the Code provides, in relevant part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others...." TEX.CODE JUD. CONDUCT, 2B.[42] The second charge was limited to the private interests of "others," namely, Miers.

We first address whether Canon 2B applies to the conduct at issue in this case. In so doing, our inquiry focuses again on a definition, this time, of the term "private interests." The Code of Judicial Conduct does not contain a definition of "private interests."

*In re Jimenez*, 841 S.W.2d 572 (Tex. Spec.Ct.Rev.1992), provides some guidance. In that case, the commission, after finding the judge had a private interest in retaliating against a policeman, privately admonished the judge for violating Canon 2B for making statements accusing a policeman of perjuring himself and selective-

ly prosecuting Hispanic males for DWI. The judge's communications followed a telephone conversation in which the policeman criticized the judge's dismissal of a suit against an Hispanic male for DWI as a "[expletive deleted] ... decision." *Id.* at 573–74. The Special Court of Review determined that the judge's actions, including one of the letters and later "media interviews" stemming from the letters and the judge's testimony in a lawsuit as to the truthfulness of the policeman, were to advance the public interest. *Id.* at 579. The court reasoned that all these communications dealt with the policeman's "alleged crimes," not with his "private insulting remarks," and were, therefore, motivated by public interest. *Id.* at 580. The court considered a "matter of public interest" to be "one that affected his [i.e., the policeman's] performance of duty." *Id.* at 580. In considering a second letter in which the judge did not mention possible crimes and public misconduct but instead referred to the judge taking "particular offense" to the comment, the court concluded the letter was not written to retaliate. *Id.* at 581. Instead, the court concluded that, even if the judge had a "personal motive of retaliation," it was not convinced by a preponderance of the evidence that his personal motive "exceeded the public motive of disciplining a police officer reasonably suspected of major crimes and minor bad manners." *Id.*

Thus, the focus of the *Jimenez* court was on the public interest of the policeman's performance of his duties as a police officer, not the judge's private interest in retaliating against an ill-mannered individ-

---

**42.** In its entirety, Canon 2B provides:
A judge shall not allow any relationship to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or

permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.
TEX.CODE JUD. CONDUCT, Canon 2B.

ual. *See id.* at 580. The *Jimenez* court also recognized a balancing between private and public motivation. *See id.* at 581. Finally, the *Jimenez* court stressed the commission never alleged any of the judge's statements were false in any respect.

▮ A legal dictionary defines "private" in part as "[r]elating to or belonging to an individual, as opposed to the public or the government.... Confidential; secret." BLACK'S LAW DICTIONARY 1233 (8th ed.2004).[43] While not defining "private interests," the Texas Attorney General has decided that the phrase "does not include candidacy." Op. Tex. Att'y Gen. No. LO–89–21 (1989). In addition, the Supreme Court of Washington, reviewing the same language, discussed the type of conduct to which Canon 2B is directed, emphasizing "the judge's use of his or her office to obtain a financial or other advantage, either for himself or herself personally or for a third party." *In re Sanders*, 135 Wash.2d 175, 955 P.2d 369, 376 (1998). We conclude that a private interest pursuant to Canon 2B is a personal or individual advantage or benefit gained by use of judicial office.

The commission asserts that a benefit of office, life tenure, as well as power and prestige, constitute "private interests" under Canon 2B. We disagree. Although the position of Supreme Court Justice comes with life tenure and as well as a guaranteed salary, *see* U.S. CONST. art. III, § 1, those factors are not necessarily private interests. Rather, they are the perquisites of the public office. Lifetime tenure and guaranteed salary safeguard the judiciary from interference from the other branches of government and promote judicial independence; thus, they are public, rather than private, interests.

The argument that the benefits of public office are private interests presumes that candidates seek office for selfish reasons rather than from a noble sense of duty. The suggestion that a public office is a private interest implies that all public officers, whether legislative, executive, or judicial, are corrupt. This Court soundly rejects any such suggestion.

The evidence before us, including numerous transcriptions of congressional hearings, clearly demonstrates candidates seeking federal judicial positions are driven by the desire and passion to engage in public service and promote the rule of law in a meaningful capacity. Furthermore, all of the expert witness testimony, most of which was stipulated to by the commission, opined that Petitioner's conduct did not advance the private interests of Miers. Under the facts presented, we are convinced this level of dedication and commitment is best described as one of public, not private, interest.[44]

---

**43.** Rather than focusing on a definition of "private interest," the commission argues from the position that Canon 2B, like Canon 5(2), prohibits a judge from publicly endorsing other candidates. However, we have already concluded Petitioner's conduct did not violate the "authorization" provision of Canon 5(2).

**44.** We are aware the commission, in its brief identified Miers' "private interests" under Canon 2B as:

political ambition, including but not limited to a candidate's desire for lifetime tenure, prestige, and power, which motivates a candidate to seek a life-time appointment to the federal bench in the first place and there is no position more prestigious, more powerful, or more remarkable and exclusive than justice of the United States Supreme Court.

The commission must prove, not just allege or argue, Petitioner lent the prestige of his judicial office "to advance the private interests" of Harriet Miers. Even if we assumed Canon 2B applied, we would reject the commission's position. The United States Constitution sets forth the length of the term of a Justice of the

Moreover, the view that seeking these perquisites as a private interest, that is, viewing candidacy for this office as a private interest, contradicts the Attorney General's decision in LO–89–21 and would equate a judge's promotion of his or her own candidacy as a violation of Canon 2B. This interpretation would also prohibit a judge from appearing on his or her own behalf at a political event, conduct expressly permitted under Canon 5(2).[45] In short, we agree that "private interests . . . do not include candidacy." Op. Tex. Att'y Gen. No. LO–89–21.

Petitioner testified about the purpose of Canon 2B:

> [T]he purpose for 2B is to keep judges from calling the district attorney, trying to get him to go easy on their kid, or the neighbor's kid, or trying to get the county commissioners to give a contract to somebody that's more friendly or less

friendly, or those kinds of things. It's not—the idea that by speaking in favor of someone who is trying to get confirmed, and has already been nominated to the U.S. Supreme Court, that that somehow advances a private interest, no one would have ever thought that. If you made a list—this canon is old, so if you made a list a long time ago and said, check off the ten things this is supposed to stop, and one of them was keeping people from promoting nominees to the U.S. Supreme Court, nobody would check that off. . . .

Canon 2B prohibits a judge from using the prestige of judicial office to pursue "private interests" such as using the position of judge to extort a financial benefit, to retaliate against another, or to obtain preferential treatment for the judge or another person.[46] Such conduct is

---

United States Supreme Court life tenure. In essence, the commission singled out part of a constitutional provision and, without any evidentiary support, argues it politically motivated Miers to seek the nomination. The commission further argues the power and prestige of the judicial position drove Miers to seek the nomination. This argument is likewise unsubstantiated by any evidence and is entirely speculative. We conclude it is spurious. The uncontroverted evidence shows Miers never sought, suggested, aspired to, or requested the nomination. She "dreaded" the idea but acceded to the President's request. Miers was prompted to accept the nomination in the public interest, in effect, to further serve. The flaw in the commission's position is that it assumes but does not prove political ambition. The commission has failed to even attempt to provide a scintilla of evidence of Miers' political ambition, and thus, failed to prove Petitioner advanced Miers' "private interests."

Even if pursuing the nomination at the President's request is some evidence Miers' political ambition to a seat on the Supreme Court, *Jimenez* recognizes a balancing between such private motivation and the public interest. *See Jimenez,* 841 S.W.2d at 581. The commission offered no argument or evidence that

Miers' private interest, that is, her "political ambition," outweighed the public interest under *Jimenez,* and our review of the evidence shows no such imbalance.

**45.** The North Carolina Code recognizes this inherent problem and permits the judge to endorse his own candidacy. The North Carolina Code specifically excepts the judge "so long as he does not expressly endorse a candidate (*other than himself*) for a specific office. . . ." N.C.Code Jud. Conduct, Canon 7B(1) (emphasis added).

**46.** *See In re Davis,* 82 S.W.3d 140, 150 (Tex. Spec.Ct.Rev.2002) (using position of judge to retaliate against an assistant district attorney); *Public Reprimand of Ken Reilly, Municipal Court Judge,* No. 04–0360–MU (Comm'n Jud. Conduct Nov. 2, 2004) (part-time municipal judge who served one-half day per month advertised his public-speaking private business, which was his primary occupation, with statements like "Bring 'The Judge' to your next meeting as a keynoter"); *Public Reprimand and Order of Additional Education of Santos Benevides, Justice of the Peace,* No. 04–0513–JP (Comm'n Jud. Conduct Nov. 2, 2004) (judge ordered felon arrestee released on personal recognizance bond because arrestee

generally perpetrated in secret or in a clandestine manner. The conduct at issue, however, is the public dissemination of information about Miers in a political context. The record does not even intimate that Petitioner engaged in any surreptitious conduct.

We hold Canon 2B was not intended to apply and does not apply to the conduct at issue in the political environment described.[47] Under these circumstances, we can hardly conclude that Petitioner's public statements would have constituted an advancement of Miers' "private interests." Accordingly, we find Petitioner not guilty of the charge of violating Canon 2B by lending the prestige of his judicial office to advance Miers' private interests.

### IX.

Analysis of the public statements in relation to the Texas Code of Judicial Conduct has been seriously hampered by the complete lack of definitions of critical terms in the Code. Terms such as "authorized," "endorsing," and "private interests" are pivotal to the provisions in which they appear, but the Code does not provide a specific meaning for the terms. This void fosters ambiguity and confusion in interpretation and application. There is no bright line of demarcation between acceptable and prohibited conduct. We decline to come down on the side of condemnation in the face of what we perceive as undeniably obvious: the ambiguity, confusion, and apparent contradictions in the content, interpretation, and application of the Canons. Perhaps an event such as the case before us will precipitate a fresh approach and renewed efforts to clearly delineate the meaning of such key terms and thereby clearly define what conduct is acceptable and what is not.

We have resolved the meaning of "authorized" by referring to the Webster's International and the Oxford English dictionaries. We conclude Canon 5(2), the "authorization" provision, does not prohibit "endorsing"; rather, the words mean what they say: the "authorization" provision prohibits a judge from authorizing the public use of his name endorsing another candidate. We cannot conclude a violation of the "authorization" provision occurred without any evidence Petitioner "author-

---

was son of 25–year acquaintance of judge); *Public Admonition of Alonzo Villarreal, Justice of the Peace*, No. 04–0285–JP (Comm'n Jud. Conduct June 25, 2004) (judge contacted municipal judge about another person's traffic ticket; when municipal judge said that was inappropriate use of judicial office, judge said "we judges help each other"); *Public Admonition of Jose Canales, Justice of the Peace* (Comm'n Jud. Conduct June 27, 2003) (judged telephoned another judge to obtain favorable treatment for county official's daughter on traffic citation pending in other judge's court); *Public Admonition of Frederick Edwards, District Court Judge* (Comm'n Jud. Conduct Apr. 12, 2001) (using position as judge in attempt to avoid arrest and prosecution for driving while intoxicated); *Public Reprimand of Marvin Mitchell, Former Justice of the Peace* (Comm'n Jud. Conduct Aug. 18, 2000) (judge telephoned girls on probation in his court for truancy and engaged in explicit sexual conversations); *Public Admonition of Don Jarvis, County Court at Law Judge* (Comm'n Jud. Conduct Oct. 22, 1999) (judge became romantically involved with married woman who had matters pending in the judge's court); *Private Admonition of a County Court at Law Judge,* (Comm'n Jud. Conduct Mar. 6, 2006) (state judge used official court letterhead to write letter to federal judge requesting leniency in sentencing state judge's relatives); *Private Reprimand of a Justice of the Peace,* (Comm'n Jud. Conduct July 14, 2004) (judge instigated groundless criminal investigation of constable who tried to serve papers on judge's son).

**47.** We note Canon 5 is entitled: "Refraining From Inappropriate Political Activity" and does specifically apply to political statements. *See* TEX.CODE JUD. CONDUCT, Canon 5.

ized" the use of his name "endorsing" "another candidate for any public office," Harriet Miers.

Although we have not resolved the meaning of "endorsing," we conclude there are alternative, reasonable definitions of "endorsing" and that, even if we accepted the commission's interpretation of Canon 5(2) as prohibiting "endorsing," a strict construction of "endorsing" means a narrower construction than just broad support, and, therefore, does not encompass Petitioner's public statements. The commission failed to prove Petitioner's public statements "endorsed" Miers. Thus, we cannot conclude Petitioner violated Canon 5(2) by "endorsing."

■ We also conclude Petitioner's public statements are, under the particular facts presented, permitted by the Canons because they qualify as legitimate responses to misrepresentations (Canon 5(1)(ii)), expressions of views on political matters (Canon 5(2)), statements that promote public confidence in the competence of the judiciary, and statements which involve the law, the legal system, and the administration of justice (Preamble, Canons 2 & 4).

Finally, we conclude Canon 2B does not apply to the political conduct at issue, and, therefore, no violation can be found.

Accordingly, we conclude the commission has failed to meet its burden of proving Petitioner violated the Canons, we dismiss the commission's public admonition, and we find him not guilty of the charges.

McCLURE, J., concurring.

ANN CRAWFORD McCLURE, Justice, concurring.

"Thirty-seven hundred judges want to know what to do." With these words, the Examiner for the Commission has asked us to clearly draw the lines and articulate the boundaries of the Texas Code of Judicial Conduct. At the outset, let me dispel any notion that this court of review is about politics. Politics may well have initiated the debate. It plays no role in the resolution. The three members of this panel are not affiliated with the same political party. But as judges, we unanimously agree that we must preserve the independence, integrity, and impartiality of the judiciary. I don't believe that Justice Hecht, a well-respected member of the state's highest civil court, would contend otherwise. How we do that within the confines of the canons and the constitution is the issue. If we as judges do not honor and respect the office and the public trust, we can hardly expect lawyers and litigants to do so. Nor can we expect the recurrent attacks on the judiciary to subside.

The majority perceives no violation of either Canon 5(2) or Canon 2B. I disagree. But because I believe the canons in issue are unconstitutional, I concur in the judgment.

## CHARGE I

### THE "ENDORSE" CLAUSE

Charge I alleges that Justice Hecht authorized the public use of his name and title to support[1] or endorse his close friend, Harriet Miers, a candidate for public office, which actions constituted willful and/or persistent violations of Article V, Section 1–a(6) of the Texas Constitution and Canon 5(2) of the Texas Code of Judicial Conduct. Canon 5(2) provides:

A judge or judicial candidate shall not authorize the public use of his or her

---

**1.** Canon 5(2) does not expressly utilize the term "support" but "endorse" is commonly defined as meaning "to give support or approval to; sanction". *Webster's New Universal Unabridged Dictionary* 600 (2nd Ed.1972).

name endorsing another candidate for any public office, except that either may indicate support for a political party. A judge or judicial candidate may attend political events and express his or her views on political matters in accord with this Canon and Canon 3B(10).

TEX.CODE JUD. CONDUCT, Canon 5(2), *reprinted in* TEX. GOV'T.CODE ANN., tit. 2, subtit G, app. B (Vernon 2005). We must determine (1) whether Miers was "a candidate;" (2) whether Justice Hecht "endorsed" her; and (3) whether he authorized the public use of his name and office in doing so. The answer to all three of these inquiries is a resounding, "Yes."

### Was Miers a Candidate?

Justice Hecht argues that while Miers was a nominee for a lifetime appointment to the United States Supreme Court, she was not a candidate for a public office within the meaning of Canon 5(2). He contends that the prohibition relates only to endorsement of a political candidate for an elected office and does not prohibit him from expressing his support of a person seeking an appointed judicial position. The Code of Judicial Conduct does not define the term "candidate" and it does not have a specialized meaning; therefore, it should be given its ordinary meaning. TEX.GOV'T CODE ANN. § 312.002 (Vernon 2005). Webster defines "candidate" as "one that aspires to or is nominated or qualified for an office, membership, or award." *Webster's Ninth New Collegiate Dictionary* 201 (9th ed.1987). The Examiner references the Merriam–Webster Online Dictionary, which defines "candidate" as "[o]ne that aspires to or is nominated or qualified for an office, membership, or award." *See* http://www.merriamwebster. com/dictionary/candidate. Even the current version of the Texas Election Code makes no distinction between persons who take affirmative action for the purpose of gaining nomination to public office and those who take affirmative action for the purpose of election to public office. TEX. ELEC.CODE ANN. § 251.001 (Vernon Supp. 2006). More *à propos* to our discussion, however, is the definition contained in the American Bar Association Model Code of Judicial Conduct. "Candidate" is defined as "a person seeking selection for or retention in judicial office by election or appointment." MODEL CODE OF JUDICIAL CONDUCT, Preamble and Canons 5A, 5B, 5C, and 5E. Finally, the record reveals that Justice Hecht himself has referred to nominees for various federal courts, including the United States Supreme Court, as "candidates," just as he considers a position on the United States Supreme Court to be "a public office."

### Did Justice Hecht's Comments Constitute An "Endorsement"?

Justice Hecht contends that just as "candidate" refers to the elective process, so does "endorsing" as used in the same context. He concedes that although a "judge commenting favorably on the proposed appointment may be said to be 'endorsing' the person in the dictionary sense of 'giving support,' the judge is not engaging in the electoral political process that Canon 5(2) is aimed at." Petitioner's Brief at 18. I must conclude that Justice Hecht "endorsed" for the same reasons I conclude that Miers was a "candidate." And in his brief, even he candidly admits:

> The information [Justice Hecht] provided about Miers' experience and qualifications certainly supported and thus 'endorsed' her nomination among those who valued the kind of background she had, although the information was undoubtedly received negatively among those who did not.

Petitioner's Brief at 19.

Justice Hecht gave numerous media interviews in which he was identified as a

justice on the Texas Supreme Court. He provided factual information about Miers' experience and background. In some of the interviews, he offered his personal opinion that Miers' nomination would be "good for the country," that she would make a "good justice," that she would be "a conservative judge" and "a strict constructionist." He also described her as "pro-life." Reasonable minds could differ as to whether these comments constitute an endorsement. The majority concludes that "endorsing" must mean more than "spoken praise." It suggests that Justice Hecht's comments did not constitute a request or an appeal to others to support her nomination. I respectfully disagree.

The Stipulation of Facts reveals that Former White House Deputy Chief of Staff Karl Rove spoke with Justice Hecht on Saturday, October 1, 2005, and asked whether he [Justice Hecht] would be willing to provide factual information to Dr. James Dobson[2] and "others who might ask" about Miers' background in general and her religious views in particular. Justice Hecht agreed to do so. In a later conversation, Justice Hecht agreed to respond to media calls referred to him by the White House, and he agreed to make daily reports to White House staff concerning the types of questions he had been asked.

President Bush announced Miers' nomination on Monday morning, October 3. That afternoon, someone from Rove's office called Justice Hecht to advise him that he had been invited to participate in a conference call of the Arlington Group. Justice Hecht had not heard of the group but learned that it was composed of conservative religious leaders. He agreed to participate, and called in at the appointed time. Dr. Dobson, who participated in the call, later told the press that he had been assured by Rove that Miers was an evangelical Christian but that he did not get reassurances about how she would vote on Supreme Court issues. Examiner's Exhibit 17.

Within the first two days following the announcement, Justice. received nearly 100 media calls and within a week, by his own count, he had responded to some 120 requests for interviews. Included in the record are videotapes, DVDs, and transcripts from various networks, including *Supreme Court Watch* [C–SPAN], *FOX News Sunday* [FOX], *Hardball with Chris Matthews* [MSNBC], and *The Situation Room* [CNN]. *The New York Times* hailed Justice Hecht as Miers' "Spokesman" in an October 6 article.[3] Examiner's Exhibit 2. And he himself joked during an interview that he was a "PR office for the White House." Examiner's Exhibit 1.

On October 10, *Texas Lawyer* reported that Justice Hecht categorized his "mission" as filling in the gaps about Miers' background and countering "some conservatives' skepticism about her qualifications." Examiner's Exhibit 1.[4] He told

---

**2.** James C. Dobson, Ph.D., is founder and chairman of *Focus on the Family,* a non-profit conservative religious organization that emphasizes family values.

**3.** The *Times* article is captioned, "Texas Justice, With Ties to Bush and His Supreme Court Choice, Serves as Her Spokesman." It offers the following reason: "For the right audiences, Justice Hecht, 55, is known as one of the most conservative jurists on the Texas Supreme Court....He has become so well known in his home state that this year he was named by Texas Monthly as one of 25 most powerful people in Texas politics."

**4.** Exhibit 1 is the *Texas Lawyer* article that formed the basis for the complaint received by the Commission. The majority correctly explains that the Commission's conclusions and findings were based on the *Texas Lawyer* and *The New York Times* articles only. Since this Special Court of Review is a *de novo* proceeding, additional media reports were in-

reporters that conservatives should "rest easy" about Miers' nomination. *Id.* Examiner's Exhibit 3 is a story from *The Dallas Morning News.* It begins:

> Like an author on a radio talk-show blitz, Texas Supreme Court Justice Nathan Hecht worked the phones Tuesday on a mission authorized at the highest levels of the White House: lending his conservative stamp of approval to Harriet Miers, his long time friend, churchmate and fellow Dallas lawyer.

Justice Hecht never sought a retraction of these or other media reports. He voluntarily participated in rallying public support for Miers' nomination and in convincing conservative religious leaders that she was an acceptable candidate. He spoke about her religious beliefs and convictions, her faith, and her pursuit of deeper meaning and greater purpose through evangelical Christian teachings. In responding to a media report that he had "embarked on a media blitz," Justice Hecht quipped that he "embarked, the same way a fishing boat embarks into a tsunami." Little wonder that he characterized his experience as "seismic." Based upon the record before us, and even applying the interpretation

that the majority has adopted, I conclude that Justice Hecht endorsed Miers.[5]

### *Did Justice Hecht Authorize the Public Use of His Name and Office?*

I also disagree with the majority as to whether Justice Hecht authorized the public use of his name and office. As I have already mentioned, the White House sought his help in reassuring Dr. Dobson, the Arlington Group, and other religious conservatives that Miers was pro-life and a strict constructionist. The White House wanted to refer media calls to him and asked him to report daily on the types of questions he was asked. He expressly agreed. These are facts to which Justice Hecht has stipulated. Examiner's Exhibit 2, *The New York Times* article, reported that "[t]he Republican National Committee put him on at least one conference call with evangelical pastors and conservative organizers. Progress for America, a group that promotes President Bush's agenda, has also been working to make Justice Hecht available for interviews." While Justice Hecht complained to another reporter that the *Times* article was misleading, he sought no retraction.

---

troduced into evidence and are part of the record before us.

**5.** Justice Hecht also takes issue with the fact that other members of the judiciary spoke publicly about Miers without facing judicial sanctions. It is true that United States Supreme Court Justice Antonin Scalia, United States District Judge Ed Kinkeade of the Northern District of Texas, Justice Elizabeth Lang–Miers of the Court of Appeals for the Fifth District of Texas, and State District Judge Jim Parsons all publicly supported Miers and spoke well of her credentials and qualifications. Of course, the Texas Canons of Judicial Conduct do not apply to federal judges. Tex.Code Jud. Conduct, Canon 6A, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit G, app. B (Vernon 2005). And the mere fact

that other state judges felt unencumbered by the canons neither justifies nor condones their conduct, nor does it lead me to the conclusion that Justice Hecht did not violate them. *Sardino v. State Commission on Judicial Conduct*, 58 N.Y.2d 286, 291, 448 N.E.2d 83, 85, 461 N.Y.S.2d 229, 231 (N.Y.1983) (each judge is personally obligated to act in accordance with the standards of judicial conduct; if a judge disregards or fails to meet these obligations, the fact that others may be similarly derelict can provide no defense). I offer no opinion on the stipulated fact that the Commission has filed no charges against any of these individuals. Nor do I address the apparently contested issue of whether the Commission could *sua sponte* investigate their conduct in the absence of a complaint.

The majority contends that a violation of Canon 5(2) requires proof that the judge gave permission for others to publicly use the judge's name in endorsements of the candidate. The record shows precisely that. Justice Hecht appeared on several television programs to debate conservatives who opposed Miers' nomination, clearly articulating the difference between legal issues and personal viewpoints[6]. The following exchange occurred during an interview with Chris Wallace of *FOX News Sunday*:

Chris Wallace: Does she regard abortion as murder?

Justice Hecht: Well, I don't know that we've ever talked in exactly those terms. But she is pro-life. I mean, you press around it all you can, but she is pro-life, and she has been for 25 years.

Q: If she does believe that, Justice, how could she possibly vote to uphold *Roe v. Wade*[7], if she believes that abortion is murder?

A: Because it's easy. Legal issues and personal issues are just two different things. Judges do it all the time. In fact, a judge is going to take an oath that says I'm going to judge rightly in cases, which means that you have to set aside your personal views in deciding the case. And if you don't do that,

you're either a bad believer in your views, a bad judge or both.[8]

Gary Bauer[9]: Look, I'm confused here. I can't tell whether Judge Hecht is arguing that [Miers] is going to overturn *Roe* or she's not going to overturn *Roe*. If he wants to reassure his fellow pro-life conservatives, that's the last argument he should be making, the argument that he just made.

Examiner's Exhibit 10. Justice Hecht responded similarly to Chris Matthews and Pat Buchanan[10] on MSNBC's *Hardball with Chris Matthews*:

Chris Matthews: Karl Rove gave you the OK to begin giving interviews like this. And we very much appreciate, Justice, you coming on, because no one else can talk about her from that Texas perspective, that longtime perspective. Are you surprised Karl Rove has basically unleashed people to come out and talk about her, that they're not more careful about making sure there's less talked about her than more?

Justice Hecht: You know, I really don't know the history on that. And I don't know what their usual policies are....But I'm happy that people are, because I think there is going to be a

---

**6.** "[E]very good judge is fully aware of the distinction between the law and a personal point of view." *Republican Party of Minnesota v. White*, 536 U.S. 765, 798 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (Kennedy, J., concurring).

**7.** *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**8.** In a separate interview with *The Dallas Morning News*, Justice Hecht explained the distinction further. "The mistake is trying to extrapolate from those personal principles, even if they're extremely important to a person, into how you're going to decide a case." According to the article, Justice Hecht "noted

that Justice Antonin Scalia, one of the Supreme Court's most conservative justices, wrote an opinion declaring a free-speech right to burn an American Flag. 'Can you imaging [sic] Justice Scalia burning a flag? It's not going to happen,' he said. 'But what does the Constitution say, can you do it or not? Yes, the Constitution says you can do it.'" Examiner's Exhibit 3.

**9.** Gary Bauer is the president of the American Values Group and is a former presidential candidate.

**10.** Pat Buchanan is an NBC political analyst and a former presidential candidate.

pretty solid consensus of view from people talking about her.

\* \* \* \* \*

Pat Buchanan: The president has asked us to elevate a blank slate to the Supreme Court to sit opposite people like Roberts and Scalia, when we have outstanding jurists who have taken a stand, been cut and blooded for their beliefs. And so, I think this is why she has got to sell herself to the country, to the conservative movement and Republican Party. And if she does not, Chris, I would urge conservatives to recommend a no-vote on this, if she does not persuade that committee that she is Supreme Court material.

Examiner's Exhibit 13. *The New York Times* article reported that "[w]hen the White House named Harriet E. Miers for a seat on the United States Supreme Court this week, Republicans turned to Justice Nathan L. Hecht of the Texas Supreme Court to make her case." Examiner's Exhibit 2. Following suit, *The Dallas Morning News* wrote:

> "If you have somebody like Nathan Hecht, whose anti-choice, right-wing credentials are so solid, and he says you're going to like her, she's one of us, that sends a pretty clear signal to that wing of the Republican Party," said Sarah Wheat, executive director of NARAL Pro-Choice Texas.

Examiner's Exhibit 3. All of this evidence leads me to conclude that Justice Hecht expressly and quite affirmatively authorized the public use of his name and office to sell the Miers' nomination.

### CHARGE II

### THE "PROMOTE" CLAUSE

Charge II alleges that Justice Hecht lent the prestige of his judicial office to advance the private interests of his close friend, Harriet Miers, which actions constituted willful and/or persistent violations of Article V, Section 1–a(6) of the Texas Constitution and Canon 2B of the Texas Code of Judicial Conduct. Canon 2B states in pertinent part: "A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others...." TEX.CODE JUD. CONDUCT, Canon 2B, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit G, app. B (Vernon 2005).

### *Did Justice Hecht's Conduct Promote a Private Interest?*

Justice Hecht contends, and the Examiner concedes, that the nomination of Harriet Miers to the United States Supreme Court and the ensuing debate over her qualifications were matters of public concern. But the sanction imposed requires a finding that Justice Hecht's very public conduct promoted Miers' very private interests. The Examiner counters that there is a real and personal private interest at stake—that of political ambition—including a candidate's desire for lifetime tenure, prestige, and power, which motivates a candidate to seek a life-time appointment to the federal bench in the first place. Examiner's Brief at 9.

The Commentary to the ABA Model Code indicates that a judge may participate in only a limited fashion in the process of judicial selection. "Judges may participate in the process of judicial selection by cooperating with appointing authorities and screening committees seeking names for consideration, and by responding to official inquiries concerning a person being considered for a judgeship." MODEL CODE OF JUDICIAL CONDUCT, Canon 2B, cmt. Justice Hecht could have answered inquiries from the White House regarding his knowledge of Miers, and he could have testified at the Senate confirmation hear-

ing, since that proceeding obviously constitutes an official inquiry about the person being considered for a judgeship.[11] But his activities went beyond the limited participation contemplated by the canon and its commentary. I do not question Justice Hecht's loyalty to and friendship with Miers. He considered himself a "central repository of information" about her. That's precisely the point. He spoke because of his personal and private relationship with her. He spoke because the candidate was "Harriet," not former State Bar of Texas President Miers, not former Locke Liddell & Sapp managing partner Miers, not former Dallas City Councilwoman Miers. If the candidate had been a different former bar president or a different firm leader or a different city representative whom he had known in years past, he may well have spoken privately to individuals vetting the candidate or agreed to testify during Senate confirmation proceedings. But he would have been more circumscribed in his comments. He wouldn't have jumped on board the "media train" and he wouldn't have joked about running "PR for the White House." These events happened because they involved "Harriet."

### Did Justice Hecht Lend the Prestige of His Office to Promote that Interest?

The evidence supports a finding that Justice Hecht lent the prestige of his judicial office to advance Miers' private interests in violation of Canon 2B. I must reject his argument that he was contacted by the media not because of his position as a justice on the Texas Supreme Court but because of his thirty-year relationship with Miers. That may well have been the motivation behind press inquiries. But every

time the media carried the story, the "source" was clearly identified, captioned, and addressed as "Justice Hecht."

In a public statement issued in 2000, the Commission cautioned Texas judges that "it is virtually impossible for a judge, at least in the eyes of the public, to separate himself or herself from the judicial office; therefore it is immaterial to the issue of misconduct that a judge does not use his judicial title or refer to his judicial position in a public endorsement of a candidate for public office." Public Statement PS–2000–2. The Examiner argues in its brief that contrary to his claims, Justice Hecht used, and allowed others to use, his position as a judge, and a Texas Supreme Court justice in particular, to influence, sway, and convince public opinion and conservatives who questioned the President's decision to nominate Miers. Examiner's Brief at 14. Because the Examiner proved these facts by a preponderance of the evidence, I agree.

### WERE THE VIOLATIONS WILLFUL?

The Commission must prove by a preponderance of the evidence that Justice Hecht willfully committed the charged violations. *In re Davis*, 82 S.W.3d 140, 142 (Tex.Spec.Ct.Rev.2002); *see* TEX GOV'T CODE ANN. § 33.001(b)(2)(Vernon 2004); *see also In re Bell*, 894 S.W.2d 119, 131 (Tex.Spec.Ct.Rev.1995). Willful conduct requires a showing of intentional or grossly indifferent misuse of judicial office, involving more than an error of judgment or lack of diligence. *Davis*, 82 S.W.3d at 148; *Bell*, 894 S.W.2d at 126. A judge need not have formed the specific intent to violate the Code; as long as he intended to en-

---

**11.** Justice Hecht was, in fact, contacted by staff attorneys for the Senate Judiciary Committee, who asked him to testify at Miers' confirmation hearing. He was out of the office at the time of the call, and Miers had withdrawn her nomination before he could return it.

gage in the conduct for which he is disciplined, he is guilty of a willful violation of the Code. *See In re Barr,* 13 S.W.3d 525, 539 (Tex.Rev.Trib.1998, pet.denied). There is no dispute whatsoever that Justice 2 intended to engage in the conduct for which he is disciplined. Although he defines willful as, "you know it's wrong and you do it anyway," he also testified that "if I had it to do over again, I'd do it again." In my view, the evidence supports a finding that Justice Hecht willfully violated the canons.

## ARE THE CANONS CONSTITUTIONAL?

I turn now to the broader constitutional concerns. Justice Hecht challenges the constitutionality of Canon 5(2) (the endorse clause), both facially and as applied to him. Similarly, he challenges Canon 2B (the promote clause) as applied. Both complaints allege the canons violate the First Amendment. Citing *Republican Party of Minnesota v. White,* 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (*White I*), he argues that these provisions do not withstand strict scrutiny analysis. The first issue is whether strict scrutiny analysis applies.

### *Does Strict Scrutiny Apply?*

In *White I,* the Supreme Court applied the strict scrutiny analysis because the intermediate court of appeals had done so and the parties did not dispute the issue. *White I,* 536 U.S. at 774, 122 S.Ct. 2528. Some legal scholars suggest that the political activity canons should not be subjected to a strict scrutiny analysis. *See* J.J. Gass, *After White: Defending and Amending Canons of Judicial Ethics,* Judicial Independence Series, Brennan Center for Justice at NYU School of Law at p. 18 (2004). The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others. *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 804, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Texas Department of Transportation v. Barber,* 111 S.W.3d 86, 92 (Tex.2003). But the Supreme Court also has recognized that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Barber,* 111 S.W.3d at 92. Both written and oral expression may be subject to reasonable time, place, and manner restrictions. *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Barber,* 111 S.W.3d at 92. When reviewing regulations on speech, we engage in a two-tier analysis. *Barber,* 111 S.W.3d at 92.

For the higher tier, "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content," the court applies "the most exacting scrutiny." *Barber,* 111 S.W.3d at 92, *quoting Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Such content-based regulations are presumptively invalid, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and they can withstand strict scrutiny only if precisely drawn to serve a compelling state interest. *Consolidated Edison Company of N.Y., Inc. v. Public Service Commission,* 447 U.S. 530, 540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Barber,* 111 S.W.3d at 92–93. For the lower tier, "regulations that are unrelated to the content of speech," the court applies an "intermediate level of scrutiny." *Barber,* 111 S.W.3d at 93, *quoting Turner Broadcasting,* 512 U.S. at 642, 114 S.Ct. 2445. Content-neutral regulations are valid provided they are narrowly tailored to

serve a substantial governmental interest, and they do not unreasonably limit alternative channels for communicating the information. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Clark*, 468 U.S. at 293, 104 S.Ct. 3065; *Taxpayers for Vincent*, 466 U.S. at 808, 104 S.Ct. 2118; *Heffron*, 452 U.S. at 647–48, 101 S.Ct. 2559; *Barber*, 111 S.W.3d at 93.

Determining which tier applies requires a court to determine whether a regulation is content-neutral or content-based. *See Barber*, 111 S.W.3d at 93. This is often not a simple task. *Id.* A content-neutral regulation generally must be both viewpoint neutral and subject-matter neutral. *Id., see Hill v. Colorado*, 530 U.S. 703, 722–23, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). As the Supreme Court has stated, "[r]egulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based regulation." *Barber*, 111 S.W.3d at 93, quoting *Hill*, 530 U.S. at 723, 120 S.Ct. 2480.

To be viewpoint neutral, a regulation must not be based on the ideology of the message. *Barber*, 111 S.W.3d at 93. The prohibitions contained in the canons are not based on ideology since they restrict all speech by a judge or judicial candidate endorsing another candidate. To be subject-matter neutral, a regulation must not be based on the topic of the message. While viewpoint neutral, the canons are not subject-matter neutral as they are certainly based on topic.

I thus conclude that the proper test to determine the constitutionality of the canons is strict scrutiny. Under the strict scrutiny analysis, any restriction on the right of political speech requires a three-pronged analysis: (1) were the statements core political speech? (2) is there a compelling state interest to prohibit that speech? and (3) is the canon narrowly tailored to serve that interest? *White I*, 536 U.S. at 775, 122 S.Ct. 2528 *Brown v. Hartlage*, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982).

### *What Does White Really Say?*

In *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (*White I* ), the United States Supreme Court considered whether the Minnesota Code of Judicial Conduct violated a judicial candidate's First Amendment rights by prohibiting him from announcing his views on disputed legal or political issues.[12] Many states, including Texas, had canons which are generically referred to as "announce" clauses:

> [I]t is clear that the announce clause prohibits a judicial candidate from stating his views on any specific nonfanciful legal question within the province of the court for which he is running, except in the context of discussing past decisions—and in the latter context as well, if he expresses the view that he is not bound by *stare decisis.*

*White I*, 536 U.S. at 773, 122 S.Ct. 2528.

### *The Facts*

Gregory Wersal first ran for the Minnesota Supreme Court in 1996. He identified himself as a member of the Republican Party, attended and spoke at party meetings, sought its endorsement, and personally solicited campaign contributions. He distributed literature criticizing

12. The court emphasized that the "announce" clause is much broader than the "pledges or promises" clause, which separately prohibits judicial candidates from making pledges or promises of conduct other than the faithful and impartial performance of judicial duties, a prohibition on which it expressed no view. *White I*, 536 U.S. at 770, 122 S.Ct. 2528.

several decisions of the court on issues such as crime, welfare, and abortion. As a result of this literature, a complaint was filed with the Minnesota Lawyers Professional Responsibility Board. The Board ultimately dismissed the complaint, but Wersal withdrew as a candidate because he feared that other complaints might jeopardize his law license.

Wersal ran again in 1998. This time, he asked the Board for an advisory opinion regarding the announce clause. The Board expressed significant doubts about the constitutionality of the canon, but it did not specifically answer his questions because he had not submitted a list of the "announcements" he wished to make. Wersal responded with a lawsuit against the Board and Suzanne White in her capacity as chair, seeking a declaration that the announce clause violates the First Amendment. Other plaintiffs, including the Republican Party of Minnesota, alleged that the announce clause prevented their membership from learning Wersal's views on various legal issues. The district court determined that the announce clause did not violate the First Amendment and the Eighth Circuit affirmed.

### White I

The Supreme Court swiftly determined that a candidate's statements regarding his or her own views on political or legal issues is protected speech. The court struggled a bit with an analysis of Minnesota's compelling state interest. Minnesota pur-

portedly enacted the announce clause to promote the impartiality of the judiciary and the appearance of impartiality. The Eighth Circuit agreed that these were sufficiently compelling. The same justifications were argued to the Supreme Court. Although "impartiality" was used throughout the Eighth Circuit's opinion, the briefs, the Minnesota Code of Judicial Conduct and the ABA Model Code, the high court pointedly noted that "none of these sources bothers to define it." *Id.* at 775, 122 S.Ct. 2528.

The majority concluded that the goal of "impartiality" could be compelling depending upon the definition assigned. While it rejected a definition of "impartiality" as meaning a lack of preconception regarding legal matters [13], it accepted the definition of promoting the state's interest in electing judges who are not biased against or in favor of a particular party. Because Minnesota had not demonstrated that the announce clause served that interest, the canon was not narrowly tailored to achieve that goal. "*[E]ven if* the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns, the announce clause still fails strict scrutiny because it is woefully underinclusive, prohibiting announcements by judges (and would-be judges) only at certain times and in certain forms." *Id.* at 783, 122 S.Ct. 2528 (Emphasis in original). The court left unanswered whether the definition could include the characteristic of open-mindedness [14], but other courts have found that open-mindedness can be a

---

**13.** Writing for the majority, Justice Scalia opined that when a case turns on a legal issue on which the judge as a judicial candidate has taken a particular stand, the party advocating the opposing viewpoint is likely to lose, but not because of bias against that party or favoritism toward the other. "*Any* party taking that position is just as likely to lose." *White I,* 536 U.S. at 776–77, 122 S.Ct. 2528 (Emphasis in original).

**14.** "Open-mindedness" demands that a judge be willing to consider views that oppose his preconceptions and remain open to persuasion. This seeks to guarantee each litigant "not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so." *White I,* 536 U.S. at 778, 122 S.Ct. 2528 (Emphasis in original).

compelling state interest. *See Kansas Judicial Watch v. Stout*, 440 F.Supp.2d 1209, 1230 (D.Kan.2006), *citing North Dakota Family Alliance, Inc. v. Bader*, 361 F.Supp.2d 1021, 1040 (D.N.D.2005); *Family Trust Foundation of Ky., Inc. v. Wolnitzek*, 345 F.Supp.2d 672, 695 (E.D.Ky. 2004); *In re Watson*, 100 N.Y.2d 290, 794 N.E.2d 1, 763 N.Y.S.2d 219 (N.Y.2003).

*White I* caught the judiciary off guard. Justice Hecht captured the sentiment when he testified, "I would say that *White* case was a bombshell when it hit and that I certainly wasn't expecting it." Few of us were.

### White II

The Supreme Court remanded to the Eighth Circuit for consideration of the constitutional viability of the "partisan activities" clause and the "solicitation" clause. *Republican Party of Minnesota v. White*, 416 F.3d 738 (8th Cir.2005) (*White II* ). Pursuant to the Minnesota Code of Judicial Conduct, a judge or judicial candidate may not identify himself or herself as a member of a political organization; attend political gatherings; or seek, accept, or use endorsements from a political organization. The solicitation clause prohibits a candidate from personally soliciting or accepting campaign contributions, although the candidate may establish committees to conduct campaigns, and solicit contributions and public support from attorneys. The committees shall not seek, accept, or use political endorsements or disclose to the candidate the identity of contributors. Relying heavily upon *White I*, the Eighth Circuit held both clauses to be constitutionally infirm.

The court first addressed the partisan activities clause, focusing upon the fact that the canon treated political parties differently than special interest groups. *Id.* at 753 n. 7. The court viewed the clause in the context of the state's interest in ensuring unbiased judges. "[T]he underlying rationale for the partisan-activities clause—that *associating with a particular group* will destroy a judge's impartiality—differs only in form from that which purportedly supports the announce clause—that *expressing one's self on particular issues* will destroy a judge's impartiality." *Id.* at 754 (Emphasis in original). In other words, "the Supreme Court's analysis of the announce clause ... is squarely applicable to the partisan-activities clause." *Id.* While a judicial candidate could not consort with a political party, the candidate could align with a special interest group, such as the National Rifle Association, the National Association for Women, the Christian Coalition, the NAACP, or the AFL–CIO.

> A judicial candidate's stand, for example, on the importance of the right to keep and bear arms may not be obvious from her choice of political party. But, there can be little doubt about her views if she is a member of or endorsed by the NRA. Yet Canon 5 is completely devoid of any restriction on a judicial candidate attending or speaking to a gathering of an interest group; identifying herself as a member of an interest group; or seeking, accepting, or using an endorsement from an interest group.

*White II*, 416 F.3d at 760. Consequently, the partisan activities clause was underinclusive.

The solicitation clause suffered the same fate. Minnesota argued that keeping judicial candidates from soliciting campaign funds served its interest in an impartial judiciary by preventing undue influence. But a number of other scenarios would allow a candidate "to stumble onto the names of contributors" since campaign finances are reported, publicly available, and widely disseminated. *Id.* at 766.

Bearing in mind the teachings of *White I*, look now to the three prongs of a strict scrutiny analysis with regard to Justice Hecht's statements.

### Were Justice Hecht's Statements Core Political Speech?

The Examiner contends that the canons do not encroach on Justice Hecht's right to engage in core political speech. It claims that *White I* extends only to a judge's comments or opinions in connection with his or her own campaign. Because Justice Hecht was speaking about Miers' beliefs and values rather than his own, the Examiner argues that no political speech was abridged:

> It is not disputed that [Justice Hecht] shared with reporters and interviewers some of his own personal views on issues such as abortion and gay marriage while discussing the Miers' nomination. However, [Justice Hecht] has never been sanctioned for making those statements, nor has he been charged in this proceeding with violating any provision of the Texas Code of Judicial Conduct by telling reporters those views. To the contrary ... [Justice Hecht] was sanctioned for assisting *Miers* and *her* candidacy by publicly expressing what he believed were *Miers'* views on disputed political and legal matters.

Examiner's Brief at 18 (Emphasis in original). Applying this analytical construct, the Examiner then concludes that Justice Hecht's oratory "was simply the expression of a personal opinion for which he was not entitled to any heightened First Amendment protection." *Id., citing Scott v. Flowers*, 910 F.2d 201 (5th Cir.1990).

In *Scott*, the Fifth Circuit addressed the First Amendment in the context of a civil rights action brought by a Texas justice of the peace challenging a public reprimand by the Commission. The reprimand stemmed from an open letter written by Judge Scott to county officials attacking the district attorney's office and the county court at law for dismissing the majority of traffic ticket appeals. Characterizing the communications as "insensitive," the Commission found the judge's conduct to be inconsistent with the proper performance of his duties as a justice of the peace and served to cast public discredit upon the judiciary. He was warned to be more restrained and temperate in the future.

Judge Scott ultimately filed suit against the members of the Commission, both individually and in their official capacities, claiming that his letter and comments to the press were protected speech for which he could not constitutionally be subjected to discipline. The district court granted summary judgment in favor of the Commission.

The Fifth Circuit began by noting that public employees occupy a unique position in First Amendment jurisprudence. *Scott*, 910 F.2d at 210. While they do not shed constitutional protections when they enter the workplace, their rights must be balanced against the interests of the state in promoting the efficiency of the public services it performs through its employees. *Id., citing Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In *Pickering*, the court adopted a two-step approach to evaluate claims of First Amendment violations by public employees. First, the court must determine in light of the content, form, and context of the speech in question, whether it addresses a matter of legitimate public concern. *Scott*, 910 F.2d at 211, *citing Pickering*, 391 U.S. at 571, 88 S.Ct. 1731. If so, the court must then "balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal

functions." *Scott*, 910 F.2d at 211. If not, the inquiry must end. The court ultimately determined that Scott's letters and comments were not simply an expression of the judge's personal opinion, but addressed matters of legitimate public concern. *Id.*

I first question the continued viability of *Scott* inasmuch as a judge's ability to offer personal opinions or viewpoints has since been found to be protected speech. Nevertheless, like the Fifth Circuit, I find the content, form, and context of Justice Hecht's speech to be a matter of legitimate public concern and accordingly, I move to the balancing test, which requires that we balance his First Amendment rights against the state's countervailing interest.

### Is There a Compelling State Interest?

Justice Hecht maintains that the Examiner has failed to articulate that compelling interest. He refers to discovery requests which the Examiner pointedly refused to answer. Yet I believe that the canons themselves identify the compelling state interests:

#### Preamble

Our legal system is based on the principle that an independent, fair and competent judiciary will interpret and apply the laws that govern us. . . .

### Canon 1. Upholding the Integrity and Independence of the Judiciary

An independent and honorable judiciary is indispensable to justice in our society.

A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary is preserved.

TEX.CODE JUD. CONDUCT, Preamble and Canon 1, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit G, app. B (Vernon 2005).

In the wake of *White I,* the Texas Supreme Court created the Task Force of the Code of Judicial Conduct to "review [the Texas Code of Judicial Conduct] to ensure that the integrity and independence of our judiciary is preserved." *Order Creating Task Force on Code of Judicial Conduct,* Misc. Docket No. 03–9148 (August 22, 2003). The court asked the Task Force to "make recommendations to th[e] Court for revisions required by law, to make suggestions on improving the effectiveness of existing cannons [sic] and to suggest other modifications consistent with the Code's broad purpose of upholding the integrity, independence and competence of the judiciary." *Id.* The final report and recommendations were delivered in January 2005. The Task Force recommended adding the word "impartial" to both the Preamble and Canon 1 "to underscore the compelling state interest of judicial impartiality." [15] This recommendation has yet to be adopted, although the Texas "announce clause" was repealed.[16]

---

**15.** In both *White I* and *White II,* the term "impartiality" was used interchangeably with "independence." *See White I,* 536 U.S. at 775 n. 6, 122 S.Ct. 2528; *White II,* 416 F.3d at 753.

**16.** As a member of the Supreme Court, Justice Hecht participates in decisions concerning amendments to the Code of Judicial Conduct. For many years, he served as the court's liaison to the Supreme Court Rules

Advisory Committee. After *White I,* he concurred in the repeal of the Texas announce clause. Writing separately, he predicted the instant debate: "It is less clear whether other Code provisions relating to judicial speech— Canon 3(B)(10) and the remainder of Canon 5—are likewise infirm. . . . Therefore I join in the code amendments approved today although I remain in doubt whether they are sufficient to comply with the First Amend-

Nevertheless, the state has a compelling interest in preserving the independence and integrity of the Texas judiciary and in maintaining public confidence in our court system. *White I*, 536 U.S. at 793, 122 S.Ct. 2528 (Kennedy, J., concurring)(nothing in the court's opinion should be read to cast doubt on the fact that judicial integrity is a "state interest of the highest order"); *In re Raab*, 100 N.Y.2d 305, 763 N.Y.S.2d 213, 793 N.E.2d 1287, 1290 (N.Y. 2003) (preserving the impartiality and independence of the judiciary and maintaining public confidence in the courts are compelling state interests).

### Are the Canons Narrowly Tailored?

A narrowly tailored restriction is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative). *White II*, 416 F.3d at 751. "In short, the seriousness with which the regulation of core political speech is viewed under the First Amendment requires such regulation to be as *precisely* tailored as possible." *Id.* (Emphasis in original).

### Canon 5(2)

#### (The Endorse Clause)

The Examiner argues that *White I* addressed only the issue of a judicial candidate's right to announce his or her own views on disputed legal or political issues. The opinion "did not concern itself with whether the First Amendment protects a judicial candidate's right to endorse other

candidates for public office" and consequently, does not apply to this case. Examiner's Brief at 16. Cautioning that the opinion is now four years old, the Examiner explains that in the intervening period, no court has held that a canon prohibiting endorsements violates the First Amendment. Instead, it continues, the only court to address the issue concluded that an endorsement prohibition is constitutional. *See In re Raab*, 793 N.E.2d at 1289.

State District Judge Ira Rabb admittedly called prospective voters urging their support for a legislative candidate, although he did not give his name or identify himself as a judge. His purpose was to garner goodwill with the Working Families Party in hopes that the party would endorse him as a judicial candidate in his own campaign for the Supreme Court later that year. Three months later, he attended a party candidate screening meeting. He was not scheduled to be interviewed, but he sat with members of the party, participated in the interviews, and asked candidates for both judicial and non-judicial offices if they would publicize the party's endorsement in their campaign literature. Judge Rabb was ultimately nominated by the Democratic Party, endorsed by the Working Families Party, and elected to the Supreme Court. He was censured by the New York Judicial Conduct Commission for engaging in improper political activity in the course of a judicial campaign. The New York Code of Judicial Conduct prohibits judges and judicial candidates from (1) participating in any political campaign for any office or permitting his or her name to be used in connection with any activity of a political organization; (2) publicly endorsing or publicly opposing (other than by running against) another candidate for public of-

---

ment." *Statement of Justice Hecht Concurring in the Amendments to the Texas Code of Judi-*

*cial Conduct Approved August 21, 2002*, Misc. Docket No. 02–9167.

fice; (3) making speeches on behalf of a political organization or another candidate; (4) attending political gatherings; and (5) soliciting funds for, paying an assessment to, or making a contribution to a political organization or candidate. *Raab,* 793 N.E.2d at 1290, *citing* 22 NYCRR 100.5(A)(1)(c), (d), (e), (f), (g), (h). The Code allows an incumbent or candidate to participate in his or her own campaign for elective judicial office.

Judge Rabb complained that the rules were both underinclusive and overinclusive. The court rejected his argument, focusing on the "critical" difference between conduct integral to a judicial candidate's own campaign and activity in support of other candidates or party objectives. *Raab,* 793 N.E.2d at 1292. The court concluded that by participating in the phone bank and candidate screening, Judge Rabb "went beyond what was necessary or integral to his own judicial races." *Id.* at 1293.

In response to the Examiner's argument that *Raab* is controlling, Justice Hecht recounts the differences between the New York and Texas canons. Texas judges can (1) affiliate with a political party; (2) attend political events; (3) express views on political matters; (4) contribute to political campaigns of other candidates; and (5) criticize a candidate for public office. He points to the ability of Texas judges to criticize other candidates and compares Canon 5(2) with the New York Code of Judicial Conduct and the ABA Model Code. Both New York and the ABA prohibit a judge from *either* publicly endorsing *or* publicly opposing another candidate. The Examiner responds:

> As a matter of clarification, Examiner would point out that [Justice Hecht] is mistaken in his view that a judge would not be sanctioned under Canon 5(2) for criticizing another candidate. There is

simply no authority to support his belief that statements that are critical of another candidate for office, aside from the judge's own opponent, would be treated differently than statements in favor of another candidate for office.

Examiner's Brief at 26. But the canons do *not* make that distinction, and the Examiner offers no support for the commentary. I suspect the 3700 judges who await this decision would be disquieted to learn that one could be sanctioned for conduct not delineated in the Code. Nevertheless, the Texas canons differ in other material respects.

Members of the Texas judiciary are permitted to provide factual information or favorable comments, either formally or informally, to screening committees, appointing authorities, and members of the Senate Judiciary Committee. The Examiner concedes this is true. Examiner's Brief at 8, 11. A judge may privately introduce judicial candidates to friends and recommend that the friends vote for the candidates. *See* Op. Tex. Ethics Comm'n No. 2 (1975). This liberty of private introduction and recommendation has been extended to all candidates for public office. *See* Op. Tex. Ethics Comm'n No. 13 (1976).

Most significant in my view is the fact that, unlike a member of the New York judiciary, a Texas judge may put his money where his mouth can't go. Simply stated, a judge may make campaign contributions to other candidates—including presidential candidates, congressional candidates, gubernatorial candidates, legislative candidates, county and municipal candidates, and other judicial candidates. In turn, we may accept contributions from these same sources as well as special interest groups. In his brief, Justice Hecht points to several members of the Commission who have routinely contributed to political campaigns, and he bitingly reveals

that one member contributed to Hillary Clinton's campaign only a month before he [Justice Hecht] was sanctioned:

> One wonders how it can be reconciled that a political candidate can be supported by a judge with money, but not words. What's good for Hillary should be good for Harriet. One would think.

Petitioner's Brief at 6. His remark is right on the money—it cannot be reconciled. From this, I conclude that Canon 5(2) is underinclusive, and "woefully" so. Because it cannot survive strict scrutiny, it is unconstitutional, both facially and as applied. If the purpose of the endorsement clause is to preserve and protect judicial independence, integrity, and impartiality, it must protect these values from attacks on all fronts. From the standpoint of public perception, one thousand dollars is every bit as compromising as one thousand words.

> If the concern is that a judge's endorsement or support of a candidate for public office will damage that judge's impartiality apparently because she is seen as aligning herself with the candidate's view or ideology, that is no less so when a judge contributes to a candidate's political campaign, which is not prohibited.

Petitioner's Brief at 34. I agree.

### Canon 2B

### (The Promote Clause)

Finally, Justice Hecht challenges the constitutionality of Canon 2B as applied. Quoting *White I,* he begins by defining terminology. The canon prohibits a judge from lending the prestige of his office to advance the private interests of another. He defines "prestige" as:

1. the power to impress or influence, as because of success, wealth, etc.

2. reputation based on brilliance of achievement, character, etc.

*Webster's New World Dictionary of the American Language,* Second College Edition (1980). He contends that the comments of a Texas Supreme Court jurist would hold little sway with the members of the Senate Judiciary Committee. Petitioner's Brief at 39. But Justice Hecht's assistance was not solicited by Karl Rove and the White House to influence the committee. His help was needed to shore up the conservative base of the Republican Party to whom many committee members owed allegiance. The idea was to have a well-respected, influential and conservative jurist reassure the committee members' constituents as a means to obtain Senate confirmation. In this context, the promote clause cannot be said to serve the state's interest in preserving judicial independence, integrity and impartiality. Whether Justice Hecht's national interviews persuaded individual senators or swayed public opinion, his independence and impartiality would be called into question only if the individuals, entities, or affiliates appeared in a case before him. In that instance, recusal would be the least restrictive alternative. Because Canon 2B is not narrowly tailored to serve the compelling state interests, it is unconstitutional as applied to Justice Hecht.

### CONCLUSION

I have previously served as the presiding justice of a formal review tribunal. In upholding the Commission sanction, I wrote for the majority:

> Does the Code of Judicial Conduct intrude into a judge's private life? Most definitely. But that is a path chosen when the decision to seek office is made. A judge must observe the high standards promulgated by the Code of Judicial Conduct both on and off the bench in order to maintain the integrity of the judiciary.

*In re Lowery,* 999 S.W.2d 639, 657 (Tex. Rev.Trib.1998, pet.denied). Though today I strike down the enforcement of portions of the Code, the aspirations live on. Judicial accountability arises in part from a justifiable concern for the relationship between judicial conduct and public perception. *Lowery,* 999 S.W.2d at 647. "While the legal profession has historically been considered a noble one, modern-day portrayals paint a picture of scorn and ridicule. In the courtroom called the media, in the trial by public perception, the image of the judicial system is at an all-time low." *Id.*

I offer two caveats before I close. First, the Commission is charged with enforcing the provisions of the Code of Judicial Conduct as promulgated by the Texas Supreme Court. I believe it has endeavored to do so in good faith while awaiting action by the Supreme Court on the remainder of the Task Force's recommendations. Sec-

ond, the robe means something to me. Every time I slip it on, I remember my oath—a vow "to preserve, protect and defend the constitution and laws of the United States and of this state." If ever I look in the mirror and see a judge who has ruled on the basis of politics, expediency, or personal gain rather than the rule of law, it is time to remove the robe and leave the bench. The citizens of this state deserve nothing less. As for the 3700 judges who want to know what to do, it is my fervent hope that each one will pause to consider this: Our *ability* to speak does not mean that we *should* speak. I haven't, and I won't.